Burritt *v.* Silliman.

---

## Burritt *vs.* Silliman and others.

A person named as executor, in a will, is not, at common law, a competent witness to sustain the will when offered for probate.

But a renunciation of the executorship will restore the competency of the witness.

If, however, executors are also appointed *trustees,* by the will, and in that capacity are to take the bulk of the estate, the power and estate vested in them as trustees will not be divested or affected by their renunciation as executors.

The requirement of the statute, in regard to publication, is positive, and a compliance with it is indispensably necessary to the due execution of a

Burritt *v.* Silliman.

will. Unless the testator himself,. in some intelligible manner, so clear and unequivocal as not to be misunderstood, communicates to the witnesses the fact that he knows and intends the instrument to be his last will and testament, the statutory evidence of the due execution of the will is not furnished.

Where it appeared that the subscribing witnesses attended at the request of one of the executors·and trustees, and signed their names as attesting witnesses at the request of another, and there was no evidence that the testatrix requested the witnesses to attest the execution; or knew that they were there for the purpose of attesting the execution of her will; or that they were in attendance at all; *Held* this was not a compliance with the statute.

Where there is no evidence that the testatrix had any thing to do with the preparation of the instrument purporting to be her will, or that she ever read it, or heard it read; or that its contents were ever even stated to her, proof that she knew what was in the paper she signed is imperiously demanded, before the same can be admitted to probate; especially, where it affirmatively appears that the mental faculties of the testatrix had become seriously impaired, by the use of strong drink and opiates.

THIS was an appeal from the decree of the surrogate of Rensselaer, refusing to admit to probate the will of Abigail Clapp. Mrs. Clapp died on the 19th of June, 1850, leaving an instrument purporting to be her last will and testament, bearing date the 30th day of March, in the same year. By this will, she devised to her sister, Mrs. Burritt, three lots, with the buildings thereon, situate on the east side of Fourth-street, in the city of Troy, and her furniture, beds and bedding, and her horse, carriage and harness. The residue of her property she devised and bequeathed to Robert D. Silliman, Samuel Kendrick and Stephen Monroe, in trust, to dispose of, sell and convey and convert the same into cash, according to their best discretion, and, after paying debts and funeral expenses, to apply the residue to the payment of sundry specified legacies, together amounting to $13,500, and among others a legacy of $500 to Mrs. Burritt, and another of $500 to Amelia Monroe, the wife of Stephen Monroe. Mrs. Burritt applied to have the will proved. Upon the hearing before the surrogate, the applicant, after examining the subscribing witnesses to the will, offered as a witness Stephen Monroe, one of the executors and devisees named in the will. He was objected to, on the ground that he

was an executor, and also that a large portion of the property was devised to him and two others as trustees. Monroe thereupon renounced his appointment as executor, and also as trustee under the will. It was still insisted that he was incompetent upon the following grounds: 1. That he could not renounce after the commencement of the proceedings 2. That he could not renounce as trustee or executor, before the will was proved. 3. That the renunciation did not release his interest as trustee in the property devised and bequeathed by the will. 4. That, notwithstanding the renunciation, he could afterwards take upon himself the office of trustee or executor, or both. The surrogate decided that Monroe was an interested witness, on the ground that he had a right, at any time before letters testamentary should be granted, to recall his renunciation and demand letters.

Samuel Kendrick, another of the trustees and executors named in the will, and by whom it was drawn, was then offered as a witness for the applicant, and rejected as incompetent, upon the same grounds. Numerous witnesses were then examined by the parties respectively upon the question of the capacity of the testatrix to make a will. The testimony upon this point, as well as upon the other questions of fact arising in the case, is sufficiently noticed in the opinion of the court.

The surrogate held that there was no sufficient evidence that the testatrix knew the contents of the will, and also that at the time of the execution of the instrument she was of unsound mind, and incapable of making a will. Upon these grounds he refused to admit the instrument to probate. Mrs Burritt appealed.

*J. Pierson,* for the appellant.

*A. B. Olin,* for the respondents.

*By the Court,* HARRIS J. The first question which presents itself for examination in this case is the decision of the surrogate in rejecting the witnesses Monroe and Kendrick as incom-

Burritt *v.* Silliman.

potent. They were offered to sustain the will. By that instrument they were appointed trustees of all the estate, except three lots in Troy devised to Mrs. Burritt, and were also appointed executors. Monroe, when the objection was made, renounced his appointment as executor, and also his right and claim to act as trustee, under the will. Kendrick, when offered as a witness, proposed to file his renunciation as a trustee and also as an executor, but the surrogate having decided that the renunciation would not render the witness competent, none was filed.

The provisions of the code on this subject have no application to proceedings in surrogates' courts. By the 8th section the application of the act is expressly confined to civil actions commenced in the courts of this state, except when otherwise provided. The sections relating to the examination of witnesses have not been made applicable to surrogates' courts, and the question before us must, therefore, be determined upon the common law rules of evidence.

Whether a person named as an executor in a will, and deriving no other benefit therefrom, is a competent witness to establish the validity of such will, is a question which does not seem to have come before the courts of this state. But in other states, where, as in this state, commissions are allowed to an executor by statute, it has been held, that the executor, by his right to commissions, takes an interest which renders him an incompetent witness. Under a statute of South Carolina, which requires that all wills "shall be *attested* and subscribed by three or more *credible* witnesses, it was held that the witnesses must be *competent* at the time of attestation, to prove the execution of the instrument, and that where one of the witnesses to the execution of the will was nominated as an executor, he took such a valuable right under the will as to render him incompetent; and being incompetent he was not at the time of attestation a credible witness within the meaning of the statute. (*See Taylor* v. *Taylor,* 1 *Richardson,* 531.) "It cannot be disputed," say the court, "that the office of executor is an appointment yielding emolument, and, as such, is a subject of

pecuniary interest and of generally acknowledged value.  All offices of profit are encumbered with the performance of duties, to which the compensation is incident.  In a contested election for such an office, neither of the candidates could be received as a witness; for it could not be doubted that he had an interest in the question."   *Tucker* v. *Tucker*, (5 *Iredell's L. Rep.* 161,) is to the same effect.   In *Allison's Ex'rs* v. *Allison*, (4 *Hawks*, [*N. C.*] 141,) the testator had by his will appointed trustees for the purpose of selling his real estate.  By the terms of the will, the trustees were "authorized and directed to retain to their own use out of the moneys that might come to their hands a sufficient compensation for their trouble in performing and executing the trust."   It was held, that as the appointment furnished the trustees with employment, and gave them compensation for it, they were not competent witnesses to sustain the will.

In these decisions I concur, although with some hesitation.   I was, at first, inclined to regard the commissions of an executor as the compensation fixed by law for services to be rendered; and which, if the services are not rendered, he is not entitled to receive.   But I am unable to distinguish between the case of an executor and that of a public office of profit.   In both cases, the law measures the salary or perquisites by the nature and extent of the duties to be performed.   Each is an employment by which wages for labor may be gained.   As the person claiming the office would not be received as a witness, in a controversy involving his right to the office, so, I think, a person named as executor in a will, is not, at common law, a competent witness to sustain the will when offered for probate.   But I do not see why a renunciation does not restore the competency of the witness.   The question relates to the time when he is offered.   If he has then no interest, it is no objection that he has before been interested, or may afterwards acquire an interest.   By renouncing, he divests himself of all present interest, and though he may retract, and his interest may thus be restored, this is a contingency which can only affect his credibility.   Such contingencies are never regarded in determining the question of com-

Burritt *v.* Silliman.

petency. If, therefore, the witnesses Monroe and Kendrick had taken no other interest under the will than their right to commissions as executors, I should be inclined to hold that the surrogate had erred in excluding them after their renunciation had been tendered.

But they were not merely nominated as executors in the will. They were also, by their individual names, appointed trustees, and in that capacity were to take the bulk of the estate. The estate vested in them as trustees was not divested by their renunciation as executors. "There is no contradiction or variance in the authorities," says Duer, justice, in *Dominick* v. *Michael,* (4 *Sand. Sup. Ct. R.* 401,) "that a power which an executor takes by force of the will, and not of its probate, is not divested or affected by his renunciation of the office." The character of executor and trustee under this will are entirely distinct. Had all the executors renounced, and administration with the will annexed been granted to some other person, they would still remain vested with the estate for the purpose of executing the trusts of the will. It was held in *Judson* v. *Gibbons,* (5 *Wend.* 224,) that a trust estate, when given to an executor, can only be divested by a release or deed of disclaimer. Without such release or disclaimer he would be considered as a devisee under the will. The objection that the renunciation tendered upon the hearing did not release the interest of the witnesses, in the property devised and bequeathed, was specifically taken, and although the surrogate excluded the witnesses for other reasons, the decision may be sustained upon this ground.

There being no error in the rejection of evidence, we are brought to the consideration of the decision of the surrogate upon the evidence before him. In the opinion delivered by the surrogate he sustains his decision upon two grounds; first, that there was no satisfactory evidence that the testatrix knew the contents of the instrument she executed; and again, that at the time of the execution, she had not sufficient testamentary capacity. Upon both points, I am inclined to agree with him.

The will was drawn by Mr. Kendrick, but upon whose procurement does not appear. There is no evidence that the testa-

Burritt *v.* Silliman.

trix ever gave instructions for drawing it, or that it was read to her, before or even after its execution, or that she ever had it in her possession for a single moment. Monroe, one of the trustees and executors under the will, and whose wife was to receive a legacy of $500, was the active party in procuring the execution. He went after the persons who became subscribing witnesses and requested them to attend. After the witnesses were introduced, they found the testatrix sitting up in bed, and in a very feeble state of health. But one of the witnesses was acquainted with her. When she was about to sign the will, Mr. Kendrick requested the witnesses to take notice, and they approached the bed. After she had signed, Mr. Kendrick requested the witnesses also to sign it. He was then sitting by the side of the bed, and the witnesses were some eight or ten feet distant. One of the witnesses testifies that the testatrix trembled very much. Twice, before she signed the will, she called for drink, and her sister, Mrs. Burritt, gave her brandy. When asked by Kendrick whether the instrument was her last will and testament, one of the witnesses thought she both nodded and said "yes," but others who were present say she merely nodded assent. Mrs. Perham, who resided at the time in the same house, and who was present when the will was signed, says that Kendrick held the paper before the testatrix so that she could see it, and asked if she would say that it was her last will and testament, and that she made no reply; but upon his repeating the question, "she slightly nodded her head in assent, but did not speak." She further says that after the will had been signed, and after Hodge, one of the witnesses, had left, the testatrix asked Kendrick if he thought her competent to make a will; that his reply was that he had seen nothing to the contrary, and that he immediately left the room. She also thought the same question was put to Haywood, the other subscribing witness. It is extremely questionable whether the testimony is sufficient to show such a publication of the will by the testatrix, or such a request to the witnesses to subscribe the will as the statute requires. I think the proof is insufficient in this respect. But assuming that a jury would be warranted in inferring such publication and re-

Burritt *v.* Silliman.

quest, from the circumstances as proved, I think the testimony wholly fails to show that the testatrix, if she knew at all that she was executing a will, had any distinct knowledge of its contents. The whole transaction seems to have been very much under the management and superintendence of Mrs. Burritt and Monroe. Mrs. Perham says that while Monroe was in her room, the evening before the will was signed, Mrs. Burritt came to him and told him she thought it was best to put off the execution of the will until morning. She also testified that about a month previous to the time when the will was signed, Monroe came to her room with Kendrick and asked permission for him to remain there until he could see whether Mr. Silliman, who had married the sister of the testatrix, or Dr. Clapp, the husband of the testatrix, were in her room ; that while Kendrick remained there she heard some person leave the room of the testatrix, after which Monroe came and took Kendrick up stairs. These, and some similar occurrences appearing in the case, show a degree of *activity* on the part of Monroe, which, when considered in connection with the peculiar condition of the testatrix, and to say the least of it, the doubtful state of her mind, tends very strongly to awaken suspicion, and promote a jealous scrutiny of the transaction.

Some witnesses, in their testimony, spoke of declarations made by the testatrix subsequent to the execution of the will, tending to show a knowledge of the fact that she had made a will, and, to some extent, of its contents. The principal witness on this subject is Eliza A. Hall, and I admit that, if full credit is to be given to all she says, it is shown that the testatrix was fully aware of all that the will contained. She details with most remarkable particularity nearly all its provisions, and not only this, but all the minute circumstances attending its execution, and states that she learned all this while watching with the testatrix one night shortly after the will was executed. But the circumstances under which this witness came to testify, as well as the story she told, were such as to justify the surrogate in awarding but little credit to her testimony. She was unacquainted with the testatrix until she came there to watch. She

had watched the night before with *Mrs. Monroe.*  She came to
watch at the solicitation of Mrs. Burritt, with whom she became
acquainted at the same time.   Differing from all the other wit-
nesses in the case, she did not think the testatrix was a drinking
woman, and was surprised that any one should think she was;
thought she had a little more sense than most people, and was
very cunning; that she talked as sensibly as any person she
ever saw; after hearing she had been in the habit of drinking
so much, she was surprised at her being so sensible, and thought
it would be better for some others to drink some, if it made her
so cunning; that she was the quickest witted woman she ever
saw; that she had a great mind, and few men could go ahead of
her.   In short, this witness knew or professed to know quite *too
much* to secure any considerable degree of confidence in her
statements.

  Mary O'Conner, to whose mother a legacy of $300 was given
by the will, also watched with the testatrix one night shortly
after the will was made.   She testifies to statements made to
her, on that occasion, tending to show that she knew the con-
tents of the will.   Two other witnesses speak of declarations
made by the testatrix in relation to her will, and the provision
she had made for Mrs. Burritt.   Such testimony, though not
the most satisfactory, would, undoubtedly be sufficient, in a case
otherwise free from suspicion, to warrant the inference that the
instrument expressed the real intentions of the testatrix.   But
in a case like this, where, conceding to the testatrix legal testa-
mentary capacity, it is abundantly shown that both her physical
and mental powers had been so far impaired by excessive drink
and other stimulants, that her mind was verging hard upon
insanity, I think it is not too much to require of those who
would support the will, proof that, at the time of execution, the
testatrix was fully cognizant of all its contents.   Here there is an
entire absence of all such proof, except what is derived from the
casual declarations of the testatrix, to one or two females who
happened to visit her, and the remarkable disclosures alleged
to have been made to the two *watchers.*   I am not satisfied from

Burritt *v.* Silliman.

the evidence, that the paper in question expresses, in truth, the real intentions and last will of the testatrix.

Were this the only question in the case, I might have felt inclined, notwithstanding the convictions of my own mind, to consent to a reversal of the decree, for the mere purpose of having the question submitted to a jury.  But when this question is considered in connection with the fact that the evidence to show a compliance with at least two of the statutory requisites is so very slight, and the strong evidence which the case furnishes to show that the testatrix was utterly incapable of making a testamentary disposition of her property, I do not think we are at liberty to make such a disposition of the case.  If this court is satisfied that the surrogate has correctly decided the questions before him, the respondents are entitled to a judgment in accordance with such conviction.

In respect to the capacity of the testatrix to make a will, there can be no doubt, I think, that the surrogate was right in pronouncing against it.  The decision is sustained by a very clear preponderance of evidence.  The subscribing witnesses, whose duty it always is, before putting their names to the will, to satisfy themselves that the testator is of sound and disposing mind and memory, and really understands what he is doing, obviously had little or no knowledge of the mental capacity of the testatrix.  They were conducted into the room by Monroe, under whose supervision the whole thing seems to have been enacted, and there they found the testatrix in a helpless, passive condition, and the whole ceremony was concluded without her uttering a word, except *to call for drink.*  The witnesses say she appeared rational and competent to make a will; but it is very evident that they had no sufficient opportunity to ascertain the real state of her mind.  (*See Scribner* v. *Crane,* 2 *Paige,* 147.)

Mrs. Perham and Mrs. Lamb, who were both inmates of the same house, and who saw the testatrix every day, speak particularly of the state of her mind.  Mrs. Perham says she sometimes was with her half of the day.  She was present when the will was signed.  She thinks she could understand a sentence when

read to her; but that she could not retain the first sentence of a will until the last was read. That her mind was in a deranged or insane state; and she was incapable of transacting business. That she was in the habit of drinking a good deal of liquor; and, after Mrs. Burritt came, which was about the last of January, she became more feeble and stupid. *Mrs. Lamb,* who is a legatee under the will, and with whom the testatrix boarded from the 26th of October, 1849, until after the will was executed, testifies, that soon after she came there, she discovered that the testatrix was in the habit of getting intoxicated; and after a few weeks the habit increased upon her, so that she was intoxicated daily. That after Mrs. Burritt came, her habits increased very considerably; and that she kept her bed most of the time. That from that time, she was constantly under the influence of stimulus and anodynes. That she took morphine, laudanum, paregoric and tincture of hops. That she had a quart of liquor a day brought into the house; and was frequently *dead drunk.* That on the day the will was executed, she was very sick and feeble; that she was then under the influence of liquor or other stimulants, and these had destroyed her mind. *Mr. Thomas,* who was an administrator of Rankin, the first husband of the testatrix, and who had known her intimately for 25 years, testifies, that some time in the winter she applied to him to draw her will; that he put her off, and visited her several times for the purpose of satisfying himself whether she was capable of making a will. That he did not think she was competent at any time when he saw her, that winter. That she was sometimes stupid; and, when not so stupid, she would talk; but her mind seemed to vacillate; she would drop right off from one subject and go to another. That he would not draw her will when he would be obliged to swear that he believed her incompetent to make it. That the last time he saw her, before the will was made, was in February; and then she was more stupid than he had ever before seen her. *Mr. Silliman,* her brother-in-law, an administrator with Thomas, of the Rankin estate; the guardian of her daughter, by whose death she had inherited the principal part of her property, was in the habit of seeing her very frequently.

He says that through February and March, and up to May, he never went there but he could see she was under the influence of liquor, or opium, or both. That he very often found her so stupid that he could not get her mind upon any thing he had to say. That her mind would wander when talking with her; and sometimes she would drop to sleep. That she was not capable of transacting any kind of business; her faculties were so benumbed. That from the time Mrs. Burritt came there, until she died, she was constantly under the influence of stimulants and opium; and her physical and mental system was entirely deranged. . *Mr. Plum,* who was the partner of her husband, had lived in the family with her, and known her intimately for many years, says: "Her mind was shattered all over. Today she would be for buying a farm here, and tomorrow she would be for going to Boston, and to somewhere else, and would scatter all over. This was her state of mind when sober. When drunk, she was cross and furious, and talking as people do when in that situation." He had seen her when she was sober. Then she would apparently have no mind. When stimulated with some drug, she was incoherent and visionary; but when sober, her mind was apparently gone. She was a confirmed inebriate; and this had destroyed both mind and body. *Dr. Richards,* who had been the partner of the husband of the testatrix, Dr. Clapp, and had known her well for many years, says her memory and her moral sense had become permanently impaired. That debauch had a worse effect upon her than upon any other person he ever knew. That her faculties had become so permanently deranged, that for the last two years of his acquaintance with her, she had not been competent to make any intelligent disposition of her property. That her insanity was permanent and incurable. There are other witnesses whose testimony is to the same effect; but I have noticed those whose opportunities for forming a correct judgment in respect to the condition of her mind, seemed to be the most reliable.

To show that the testatrix was capable of making a will, the only professional witness called was *Dr. Cary.* He attended her for the last fortnight of her life. She was then laboring

under a great amount of disease, he says, brought on by the use of ardent spirits and opiates; and was afflicted with a general debility. He thought her mental capacity for transacting business was good, at times; but at other times, she was exercised with a good deal of pain, which would render her incompetent. It is quite apparent that this witness had little or no opportunity to form any opinion of the state of her mind, about the period when the will was executed; and, upon his cross-examination, he says, that all he means to say is, that *at the moment* he saw her, at his first interview, which I understand to have been about the first of June, she was competent to do business. He says, however, that no matter of business was spoken of, except that she expressed a great deal of gratitude to her Maker that so much property had been left to her. Besides Dr. Cary, six or eight females, and among others, Eliza A. Hall and Mary O'Conner, whose testimony has already been noticed, testified that they had occasionally seen the testatrix during the winter and spring preceding her death; and, in their opinion, she was capable of transacting business.

Several letters, written by the testatrix, between the 30th of October and the 17th of January, previous to the execution of the will, were also given in evidence. There is certainly nothing in these indicative of unsoundness of mind. It is entirely manifest that such letters could not have been written by the testatrix about the period when the will was executed. The whole body of the evidence unites to show, that between the 17th of January, when the last letter was written, and the 30th of March, when the will was signed, the diseases which her inveterate habits had brought upon her, had made fearful advances, and she had become the passive instrument of those by whom she was surrounded. The more I have examined the testimony in the case, the more fully I have become convinced that the testatrix, when the will was signed, had not the mental capacity necessary to enable her to make a valid disposition of her property.

I am, therefore, of opinion that the decree appealed from should be affirmed. 1. Because there is no satisfactory evi-

dence that the testatrix, when she signed the will, in any way declared, either by words or signs, that the instrument was her last will and testament. The requirement of the statute is positive. Unless the testatrix herself, in some intelligible manner, so clear and unequivocal as not to be misunderstood, communicated to the witnesses the fact that she knew and intended the instrument to be her last will and testament, the statutory evidence of the due execution of the will is not furnished. The legislature have declared such a publication of the nature and object of the instrument indispensably necessary to the due execution of a will. In this case, when we consider the evidence in respect to the mental and physical condition of the testatrix, it cannot be said that the *nod of assent*, made by the testatrix, or the *faint response* heard only by one of the persons present, amounted to such a declaration as will satisfy the positive requirements of the statute. 2. Because, there is no evidence that the testatrix requested the witnesses to attest the execution. The witnesses themselves say that they attended at the request of Monroe; and signed their names as attesting witnesses at the request of Kendrick. I am not satisfied from the evidence that the testatrix knew that the witnesses were in attendance at all; and much less that they were there for the purpose of attesting the execution of her will. If the question put directly to the testatrix, whether the paper she had signed was her last will and testament, required to be twice repeated to obtain a slight nod of assent, can we say that the request of Kendrick, addressed to the witnesses, was heard and understood by her? Ought he not, at least, to have inquired whether it was her desire that the persons present should become attesting witnesses? 3. Proof that the testatrix knew what was in the paper she signed, was imperiously demanded by the circumstances of the case. There is no evidence that she had any thing to do with the preparation of the instrument; or that she ever read it, or heard it read; or that its contents were ever even stated to her. The evidence of her subsequent statements entirely fails to meet this necessity. 4. Because I am entirely satisfied that when the will was exe-

cuted, the testatrix had not sufficient mind or understanding to qualify her to make a legal disposition of her property. From the time Mrs. Burritt came to reside with her, she had given herself up to the unrestrained indulgence of her appetite for drink. Mrs. Burritt herself, when she came, declared that she had got to be a mere child; that she was a mere wreck of a woman. The two months that elapsed between that time and the making of the will, were sufficient to complete the ruin. Probably not much less than a quart of liquor a day was procured for her use; and this, with the opiates constantly administered, had destroyed her mental faculties. I admit that " the man of mean understanding: yea, though he, (like Alice Lispenard,) incline to the foolish sort, is not prohibited to make a testament." (*Swinburne on Wills*, 127.) But this is not a case of weak understanding. It is rather a case of " unsound mind." Blackstone, in enumerating the persons who, by reason of mental disability are incapable to make a will, mentions " such as have their senses besotted with drunkenness." (2 *Bl. Com.* 496.) The testatrix, according to the testimony, was in this condition when she signed the will. In the language of Lord Coke, she had, " by her own vicious act, deprived herself of memory and understanding." For all these reasons the decree should be affirmed; and I think, too, with costs.

[ALBANY GENERAL TERM, February 7, 1853. *Watson, Parker* and *Harris,* Justices.]