NEW YORK COUNTY.— HON. D. G. ROLLINS, SURRO-
GATE.—June, 1882.

HYATT V. LUNNIN.

*In the matter of the probate of a paper propounded as
the last will and testament of MARY ANN HYATT,
deceased.*

Where a decedent, at the time of the alleged execution of a will, is shown
to have been aged, ill, physically feeble, and with impaired senses,
though of unquestioned mental capacity, mere proof of the due ob-
servance of the formalities of subscription and publication will not
justify a decree admitting the instrument propounded to probate.

The possibility that even the falsest witness may stumble upon the truth
renders it unsafe to infer, merely from discredited testimony, the ex-
istence of a state of facts diametrically opposed thereto.

The paper propounded as decedent's will was in writing. It appeared
that, at the time of execution, she was nearly seventy years of age,
very deaf, of impaired vision, able to read only print and to write only
her name, debilitated and confined to her bed by a mortal disease; on
the other hand, however, also, that she was of sound mind, complied
with all the prescribed formalities of execution, and fully believed the
instrument subscribed by her to contain the expression of her intentions
with respect to the final disposition of her estate. It further appeared
that one of the three subscribing witnesses, who was in her employ, was
largely concerned in the preparation of the paper propounded, and en-
joyed the confidence of decedent. This witness testified that, several
weeks before decedent's death, he entered into and carried out a con-
spiracy with decedent's son, which resulted in the execution of the
paper propounded; that he, after repeatedly urging upon her the im-
portance of making a will, at length obtained from her suggestions for
its contents, and an incomplete draft as an outline; whereupon he
caused to be prepared a type-written draft—of which the paper pro-
pounded was a transcript—and which, through his intentional modifi-
cation and distortion, did not express her disclosed testamentary pur-
poses; that he took this draft to decedent, falsely pretending that it was
in consonance with her expressed wishes, which pretentions he sup-
ported by misreading and partial suppression of its contents; that she
received no information, save that which he himself gave, as to the

tenor of the paper which she mistakenly supposed to be her will. His character as a witness was shown to be worthless.

*Held*, that, laying aside this testimony as valueless, either for or against the alleged will, the condition and circumstances of decedent called for more than mere formal proof of execution, in order, as required by Code Civ. Pro., § 2622, to satisfy the Surrogate "of the genuineness of the will, and the validity of its execution," viz.: evidence that decedent's mind accompanied the will, and she was cognizant of its provisions; and that, for the lack of such evidence, probate must be refused.

APPLICATION for the probate of decedent's will by John E. Lunnin, named as executor therein; opposed by Washington I. Hyatt, one of the next of kin of decedent. The facts appear sufficiently in the opinion.

THORNTON, EARLE & KIENDL, *for proponent.*

WALTER T. ELLIOTT, *for contestant, Washington I. Hyatt.*

LUCIUS MCADAM, *for Edwin F. Hyatt.*

THE SURROGATE.—Should the paper here propounded as the will of the decedent be admitted to probate? It is attested by three witnesses—Ira W. Beers, Warren A. James and George H. Poole. As to the incidents attending its execution, their statements vary in some particulars. It is established, however, to my satisfaction, that, at the time of signing this paper, the decedent was of sound and disposing mind; that she executed it in the presence of the three persons above named, and requested them to act as witnesses; that she published it as and for her last will and testament, firmly believing that it contained such final disposition of her estate as she desired to make, in view of her approaching death.

But there is a question of the utmost gravity, which presents itself at the very threshold of this inquiry. Did Mrs. Hyatt know the contents of this instrument? Does

it declare her true purpose, or is it the product of treachery and fraud?

The subscribing witness, Poole, testified that, in the lifetime of the decedent, he was in the employ of herself and her son, Edwin, who carried on a patent medicine business in Grand street; that, several weeks before her death, which took place about a fortnight after the execution of the instrument in question, Edwin requested him to impress upon his mother the importance of making her will; that he did so on several occasions, and with such success at last, that Mrs. Hyatt yielded to his importunity; that she suggested to him certain matters which she wished incorporated into the will; that she gave him an incomplete draft prepared about a year previous, as the outline of a proposed will, which was never executed; that, with the assistance of Edwin, these various suggestions, modified and distorted as hereinafter stated, were embodied in a paper whose contents, save for the absence of an attestation clause, were in exact conformity with the paper here propounded; that he procured two copies thereof to be prepared by the type-writing process, from one of which the written copy afterwards executed as the will was made by John Lunnin, who is named as its executor; that he took this type-written copy to Mrs. Hyatt, falsely pretending that it was in full consonance with the wishes which she had previously expressed; that, for the avowed purpose of informing her of its contents, he read it to her in a loud voice, but that, in pursuance of a conspiracy with Edwin Hyatt, he read it falsely, inserting words which were not there, and suppressing others which were; that Mrs. Hyatt, for example, had expressed to him her desire that her children should receive only

the income of her estate, and that, by his false reading, he led her to believe that the paper corresponded in that regard with her wishes, whereas in fact it devised and bequeathed her entire estate to her children absolutely; that decedent had told him that the business which was conducted in Grand street, in the name of Hyatt & Hyatt, belonged wholly to her, but that by a certain portion of the will, which he did not read to her, it would appear that she was interested only to the extent of one half part; that, so far as he knew, Mrs. Hyatt could not read writing, and that she received no information save that which he himself gave her, as to the contents of the paper which she mistakenly supposed to be her will. This story of his own infamy was recited by the witness with the utmost coolness and unconcern. He produced one of the type-written documents, upon which there appeared certain memoranda, in a handwriting which he said was his own. When or where these memoranda or any of them were made, he professed to be unable to state with definiteness, but said that the last of them was written within a few weeks after Mrs. Hyatt's death, and that, since that time, so far as he knew or had reason to believe, the paper had always remained in his overcoat pocket, and had never been seen by any person whomsoever, until after the commencement of his examination in court; that he had told nobody of its contents, or even of its existence, or of the fact that he had treated Mrs. Hyatt in such rascally fashion; and that he had not given the slightest intimation to the counsel for the objector as to the nature of the testimony which he was able to give upon the subject of this controversy.

It is needless to specify the many particulars wherein

these statements of Poole were discovered to be untrue. No person connected with the trial would dispute that the witness indulged himself in a long series of wilful and deliberate falsehoods. His whole story might well be discredited and discarded for that cause. Certainly, no court would be justified in reaching any conclusion which rested solely on such tainted testimony.

But what is the posture of the case, if Poole's account of his behavior is tossed aside as worthless? The question still recurs: Did he or did he not purposely misread the draft of the will, and cheat Mrs. Hyatt into the belief that the terms of that paper accorded with her wishes?

I cannot find that he did, upon his unsupported statement; nor can I, on the other hand, upon such unsupported statement, find that he did not, but that, on the contrary, he read the paper correctly or did not read it at all, and that in truth and in fact, Mrs. Hyatt thoroughly knew and approved its contents. There is a possibility that even the falsest witness may chance to stumble upon the truth, and this circumstance makes it unsafe to hold that his swearing to the existence of a given state of facts is sufficient of itself to establish the existence of a state of facts diametrically opposite.

As the honesty, therefore, of Poole's dealings with Mrs. Hyatt cannot be justly inferred from his describing them as dishonest, we must look elsewhere to find the evidence, if any there be, which shows that she knew the contents of the paper in question. At the time of its execution, Mrs. Hyatt was nearly seventy years old. According to the testimony of Dr. James, she was suffering from cancer of the womb; was confined to her bed; was

weak and debilitated, and was dying from exhaustion. She was very deaf, and her eyesight was somewhat impaired. The evidence is very convincing that she could read nothing but print, and write nothing but the letters of her own name.

That Poole was largely concerned in the preparation of her will, is a fact which is well established by other testimony than his own. That she had confidence in him, and might well have rested content with any statements he chose to make to her, there is no room to doubt. Now, no witness, except Poole, pretends that he ever read the proposed will to Mrs. Hyatt, or informed her of its provisions, or heard her say anything which would indicate that she knew what it contained. If she had been younger, in better health, able to read writing, I might presume that she knew not only the general character of the instrument which she executed, but the terms in which it was couched. But it seems to me that, upon all the circumstances of the present case, such presumption would be wholly unwarranted.

On the one hand, is the shameless testimony of the only person to whom decedent fully disclosed her purposes, asserting, in the most positive terms, that those purposes have not found expression in this instrument.

On the other hand is—nothing; and Poole, though worthless as a witness, is valuable as an exhibit. For when it is considered that he unquestionably played an active part in the preparation of the so called will, little reason is found for doubting its fraudulent character, except, possibly, in the fact that he swears to it.

Now the judicial decisions, applicable to such a state of facts as this, all declare the same doctrine. In Fincham

v. Edwards (*3 Curteis, 63*), the court held that, to establish the will of a person almost blind, proof must be given that it was read to him, or that he was accurately told what it contained, and that " its contents were conformable to his instructions and intentions." To a similar effect is the decision in Hostilow v. Stobie (*1 Law Rep., P. & D., 64*).

Says Surrogate Bradford, in Weir v. Fitzgerald (*2 Bradf., 42*): "Something more than formal proof of execution is necessary to establish the validity of a will, when, from the infirmities of the testator, or the circumstances attending the transaction, the usual inference cannot be drawn from the execution itself." Additional evidence is then required, that the testator's mind accompanied the will, and that he was cognizant of its provisions.

In Burritt v. Silliman (*16 Barb., 198*), it was held that, in the absence of evidence that a testator had anything to do with the preparation of the will, or that he ever read it, or heard it read, it was imperative that there should be some proof of his familiarity with its contents before it could be admitted to probate. To the same effect are Chaffee v. Missionary Con. (*10 Paige, 85*); Van Pelt v. Van Pelt (*30 Barb., 134*); Barry v. Boyle (*1 Thomp. & Cook, 422*); Lake v. Ranney (*33 Barb., 49*).

Many of the significant propositions which, at page 66 of the case last cited, the court lays down as facts established by the evidence, might, by a singular coincidence, be adopted, word for word, as applicable to the case at bar.

It is provided, by section 2622 of the Code, that "before admitting a will to probate, the Surrogate must inquire

particularly into all the facts and circumstances, and must be satisfied of the genuineness" of the document propounded.

My inquiries in the present case have not satisfied me that the document here offered for probate is the will of Mary Ann Hyatt.

A decree must, therefore, be entered adjudging its rejection.