RANSOM LAKE and CLARISSA his wife, *appellants, vs.* OLIVER
F. RANNEY and HARLOW GOFF, executors, &c. and HAN-
NAH RANNEY, *respondents.*

33b 49
43ap443

In every case, when a will is presented to the surrogate for probate, the *onus
probandi* lies upon the person propounding it; and he must satisfy the
conscience of the surrogate that the instrument so propounded is the last
will and testament of a free and capable testator.

In ordinary cases, it is sufficient for the individual offering a will for probate
to prove a compliance with the formalities prescribed by statute; but when
circumstances of suspicion exist, more is required, and proof should be
given to satisfy the tribunal that is called to pronounce upon it, that the
paper offered is in truth the will of the testator, declaring his intentions.

There should be some affirmative evidence that the testator knew the contents
of the will, and that it expressed his real intentions—that his mind went
with the will.

Where the testator was, at the time of the execution of the will, seventy years
of age, the will was prepared and witnessed by R., one of the executors,
who propounded the same for probate and whose wife was the principal
beneficiary and was also entitled by its terms to the bulk of the estate, and
contingently, and in a measure dependent upon the discretion of her hus-
band, to the whole estate; R. being, at the execution of the will, and from
that time until the death of the testator a member of his family, and hold-
ing a fiduciary and confidential relation to him; and where by such will the
division of the testator's estate between his two daughters, his only heirs at
law, was grossly unequal; and the testator, by reason of his infirmities
mental and bodily, as well as his ignorance, was liable to be imposed upon
by others, in respect to the contents of his will and the disposition of his
estate; and the will was executed under circumstances somewhat peculiar
and suspicious, and without all the cautions and safeguards usually adopted;
there being no evidence that the will had ever been read to the testator, or
that he knew the contents thereof, or had ever directed, or given instruc-
tions for, the preparation of the will as it was prepared and executed; and
further, where the evidence was not satisfactory that the testator intended
to distinguish between his daughters, in the distribution of his property;
or that he knew that he had done so, by the will prepared by R. and exe-
cuted under his supervision; and there was no proof of any declaration of
intention to execute an instrument of that tenor, or of any subsequent re-
cognition or knowledge of its contents, but on the contrary there was some
positive proof that he was ignorant of its contents; *it was held,* reversing
the decree of the surrogate, that the evidence failed to establish that the
instrument propounded was the will of a free and capable testator.

An issue was accordingly awarded, to try the questions arising upon the ap-
plication to the surrogate for probate of the will.

It was *further held* that the fiduciary relation of R. to the testator, his agency
in drawing the will and procuring its execution, and the beneficial interest

of himself and his family under it, created a presumption of fraud and undue influence which could only be overcome by some satisfactory evidence that there was no fraud practiced, or undue influence exercised, over the testator.

THIS is an appeal from an order or decree of the surrogate of Oneida county, admitting a paper writing, purporting to be the last will and testament of John Goodhue, late of Augusta, in said county, to probate. The facts in the case, as they appear from the surrogate's return, are as follows : The testator, John Goodhue, died on the 24th day of December, 1856. His occupation had been that of a farmer. In early life, he had been regarded as a careful and close manager, as far as farming was concerned. His education, however, was very limited. He could read the newspapers somewhat. He wrote poorly, and was poor in figures. He trusted to his memory in keeping accounts. Any written memoranda were made by his wife or daughters. He had an evident want of business knowledge. His wife took charge of the money, receiving payments when sick in bed, and signed his name to notes. With the exception of mere farming, he relied upon the advice of his wife or family in matters of business, in buying and selling, etc. She had more influence in his affairs than women usually possess, and he was in the habit of yielding to her. During his marriage, the testator had been the father of six children. Four of these, all adults, had died before 1830, with the exception of one, a daughter, who, being at the time wife of Dr. A. W. Marsh, died in 1842. None of these children left any descendants. At the time of the execution of the supposed will, and at his death, he had two living children, who are his sole heirs at law. Hannah, wife of Oliver F. Ranney, having married in 1841, and Clarissa, wife of Ransom Lake, having married in 1843. The testator was a man tenderly attached to each and all of his children. He was much affected by the loss of those who had died, and equally fond of those who had survived. The appellant, Clarissa Lake, lived with the testa-

Lake *v.* Ranney.

tor till her marriage, kept his accounts, and always lived on good terms with him. In the fall of 1837, when at the age of sixty, he had a severe fit of sickness, from which he never fully recovered, according to the statements of his family physician and former son-in-law. This illness was very protracted. Its effect was to diminish his energy and activity, and to enfeeble his mind. This had become especially apparent at the time of the execution of the will, and for two or three years before. Without particularizing dates, the facts regarding the general condition of his intellect and of his physical health, at that time, may be stated as follows : He was very forgetful, or rather had lost his memory. He was on the slightest occasion affected to tears, both while engaged in his occupation and in conversation. He lost interest in present matters, and only cared to ' recount past experiences. He would repeat these old stories over and over again, in the same conversation. Allowed his property to go to waste. Sold it much below its value. He was absent-minded. Was vacant in appearance, and would start suddenly. He trembled when excited. Appeared childish. He regarded himself as weak in mind, and forgetful in regard to matters of business, and declined to do business. In 1845 he did not write as well as usual. His acquaintances called him a changed man. He could not count money, but always called upon others. He was at times easily influenced, and at other times suspicious, and feared deception. He was deaf. The testimony, also, shows vacillation of purpose, general mental weakness, and growing imbecility, and that he had not sufficient judgment to transact business after 1843, although he continued to do ordinary work about the farm. He and his wife were convinced in 1844 that he was unfit to carry on business. They consulted with Dr. Marsh as to the best course to be pursued. It was proposed to him by Mrs. Goodhue, in the presence of the testator, that he should come and live with them, and take care of the property. The appellants were next thought of, but it was said that the

father and mother of Mr. Lake required his care, so that they could not come. It was finally determined that the respondent, Ranney, then in the city of New York, should be invited to come to the farm and take care of the testator and his wife. It was concluded that he should receive fifty acres more than his share of the property for his services, if he would come. The testator did not like Ranney, and had had trouble with him. There was no other resort. The offer was made and accepted upon these terms. Ranney so understood it. The testator so understood it. Ranney, the respondent, knew the testator's mental weakness, and spoke freely of it. In the fall of 1844, the respondent Ranney, with his family, removed to Augusta, in accordance with the arrangement above indicated, and took charge of the testator's affairs. The testator's wife was then sick of the disease of which she died in the winter following, January 12th, 1845. This event greatly affected the testator, and he was more broken down than ever. In the spring he was so sick that he was confined to the house, and could not see people. During the coming summer, he was feeble in health, was frequently faint, had a poor appetite, and was unfitted for work. During this summer the respondent so conducted himself as to give an impression to the testator that he was about to go away with his family and leave him alone. After the respondent came to the premises of the testator, he took charge of all his matters except mere farm labor. He took possession of his funds, transacted his business, paid bills, demanded receipts. In short, the testator was completely dependent upon him. In one instance, in the month in which the supposed will was executed, a bill being presented, the respondent handed money to the testator, and the testator paid the debt. The respondent, Ranney, had at earlier times attempted to control the management of the testator's property, and without his knowledge, and to influence the testator in his business transactions. The paper writing in question was executed on the 19th day of July, 1845. The respondents, Oliver F. and

Hannah Ranney, together with their young child, were then living with the testator.   O. F. Ranney was at the time from 30 to 32 years of age.   Ranney was engaged during the day time as a clerk in the store of one Robert J. Norris, at Augusta Center.   Norris and George G. Sperry, the latter being a fellow clerk with Ranney, and a lad of 15 years of age, were witnesses to the will.   The paper was executed at the residence of the testator, two miles south from Augusta Center, and an equal distance north from Oriskany Falls.   The younger witness went from Augusta Center to the house of the testator, with Norris, and at his request, having been informed by him of the purpose for which they were going. The time of the execution was Saturday afternoon.   The respondent, O. F. Ranney, was not at the store that afternoon, though he had been in the morning.   The witnesses on reaching the premises of the testator, saw the respondent, O. F. Ranney, outside of the house.   The testator was in the front room of the house, one of the doors to which opened directly into the open air.   Through this door the witnesses entered.   The testator was found seated at a table with pen, ink, and the paper writing before him.   The formal act of execution was gone through with.   The door remaining open, the respondent came there once or twice during the execution. The will was not read.   It was wholly in the handwriting of the respondent, O. F. Ranney, with the exception of two or three lines of the attestation clause, which were in the handwriting of the witness, Norris.   This writing by Norris was after the testator had signed, and before the witnesses had subscribed their names.   The respondent, Ranney, was in the room or at the door, while Norris was writing.   Immediately before the execution of this writing, the testator declared that he had given Ranney fifty acres of land, and intended to divide the rest of his property equally between his children.   This conversation took place between March and November, 1845.   The same statement was repeated to another witness in the same year, about June 1st.   After the

execution of the will, it was substantially repeated in many instances to different witnesses. The contents of this will and the fact of its existence were concealed from the appellants. Mrs. Lake was not at the house of the testator during the summer of 1845. No one was present at the execution but the respondent Ranney, and the witnesses. The appellant, Mrs. Lake, was denied all information upon the subject. The testator was not aware of its contents, but supposed, contrary to the fact, that it favored an equal distribution, as a former will had done. The only time that its existence was recognized was 9 years after, when all that can be learned is that he had partly forgotten its provisions. When the will was executed, the testator possessed real estate worth $7500, and personal property worth from 12 to $1500, making a property of about $9000. After the execution of the will, the health and mental faculties of the testator continued steadily to decline. He could not in the fall of 1846 be trusted to travel alone, or to ride. In the year after, his mental disease culminated in a fit, so severe that his former family physician, Dr. Marsh, was sent for professionally from Palmyra, where he then practised. In 1853, he had reached a point where he was entirely broken down; would cry one minute and would laugh the next. His mind would run from one thing to another; grew more and more deaf; would break out in sudden and unconnected remarks, to which no attention was paid, yet at this same time he could recall old events, talk about the best modes of farming, and answer common place questions upon the subject of religion. During the entire period, from 1846 down to his death, his business matters were exclusively managed by the respondent Ranney. The one or two instances in which he made purchases or sales, can at most only be treated as individual exceptions to a fixed general rule. On the death of the testator, the supposed will was offered for probate to the surrogate of the county of Oneida by the respondent, Oliver F. Ranney, and was contested by the appellants. After advisement an

Lake *v.* Ranney.

order was entered by the surrogate on the 25th day of September, 1857, admitting the instrument to probate as the last will and testament of the said John Goodhue. From this order the appellants appealed to this court.

*Theo. W. Dwight,* for the appellants. I. This will is defectively proved. Although proof of the formal act of execution is ordinarily sufficient, yet it is not sufficient in these instances: (1.) Where the party propounding the will to the testator lives in his family. (*Cooke v. Lamotte,* 11 *Eng. L. and E.* 26.) (2.) Where the party propounding it, or his wife, takes a benefit under it; especially if it be in his handwriting. (24 *English L. and E.* 58. *Mowry v. Silber,* 2 *Bradford,* 133. *Leaycraft v. Simmons,* 3 *id.* 35. *Crispell* v. *Dubois,* 4 *Barb.* 393, and cases cited, especially *Barry* v. *Butlin,* 2 *Moore, P. C.* 482. *Paske* v. *Ollat,* 2 *Phillimore,* 323. *Parminster* v. *Butler,* 3 *id.* 456. *Scoular* v. *Plowright, Lond. Law Times, January* 3, 1857. *Baker* v. *Batt,* 2 *Moore, P. C.* 824. *Durnell* v. *Corfield,* 1 *Robertson's Ecc.* 63. *Watterson* v. *Watterson,* 1 *Head, Tenn.* 1. *Patten* v. *Allison,* 7 *Humph.* 334. *Cox* v. *Cox,* 4 *Sneed,* 88.) (3.) This is especially true when the proponent holds a *fiduciary* relation to the testator as respondent Ranney did. (*Vreeland* v. *McClelland,* 1 *Brad.* 393. *Wilson* v. *Moran,* 3 *id.* 172. 1 *Jarman on Wills,* 42. *Hargrave* v. *Everard,* 6 *Irish Ch. R.* 278; *Lond. Law Mag. Feb.* 1858, *No.* 118, *p.* 371, *and cases before cited.*) In this class of cases affirmative proof of some kind must be offered, to show that the mind of the testator went with the will; such as instructions, or opinions formerly entertained, or subsequently expressed. (*Allen* v. *Pub. Adm.,* 1 *Brad.* 378. *Wilson* v. *Moran,* 3 *id.* 172. *Wightman* v. *Stoddard, Id.* 393 *and* 107. *Maverick* v. *Reynolds,* 2 *id.* 360, 261, 69. *Waterman* v. *Whitney,* 1 *Kernan,* 169.) (4.) Wherever a person is but poorly educated, the execution will be narrowly watched. (1 *Curteis,* 126. *Van Pelt* v. *Van Pelt,* 30 *Barb.* 134. *Baker* v. *Batt,* 2

*Moore, P. C.* 326. (5.) The proponent knew the testator's mental state, and ought to be prepared with affirmative proof. (*Dufaur* v. *Croft,* 3 *Moore, P. C.* 147.) The appellants claim that on the case made by the respondents, there was no such proof of the will as the law requires, and that probate ought to have been refused. (*Baker* v. *Batt,* 2 *Moore, P. C.* 236.) It is the respondent's own fault if he cannot prove instructions. (*Durling* v. *Loveland,* 2 *Curteis,* 238. *Ingram* v. *Wyatt,* 1 *Hagg.* 439.)

II. The will ought to have been refused probate, because it was positively void, being obtained by undue influence, restraint and fraud. 1. Undue influence, &c., can be inferred from the following grounds: (1.) The will was contrary to the intentions of the testator. (*Ingram* v. *Wyatt,* 1 *Hagg.* 388. *Marsh* v. *Harding,* 2 *id.* 87, 361. 26 *Verm.* 42, and cases. 4 *Brad.* 311, 318. *Scoular* v. *Plowright,* 28 *Law Times,* 194.) (2.) It is unequal and unreasonable in its provisions. (3.) It is unnatural for a person in the situation of the testator, and complicated. (*Durnell* v. *Corfield,* 1 *Robertson, Ecc. R.* 64, by *Dr. Lushington,* 5 *Gill & John.* 301. *Godbault* v. *Pub. Adm.,* 4 *Brad.* 226. *O'Neil* v. *Murray, Id.* 311.) The character of the proponent does not aid the transaction. (*Id.* 1 *Cox,* 112.) (4.) The respondent, O. F. Ranney, actively interfered with the control of the testator and the concoction of the will, securing to himself an unreasonable and unconscientious advantage. (*Darley* v. *Darley,* 3 *Brad.* 507. *Roberts* v. *Travick,* 17 *Ala.* 57.) (5.) The mind of the testator was imbecile, and his bodily health poor. 1 *Littell,* 102, holds there are no presumptions of lucid intervals in cases of imbecility. (*Dean's Med. Jur.* 481–485. 1 *Beck,* 716, 751-2, 817-18, note. 1 *Hagg.* 359. 19 *Ves.* 285. *Van Pelt* v. *Van Pelt,* 30 *Barb.* 134. *Mowry* v. *Silber,* 2 *Bradf.* 133. *Shelford on Lunatics,* 361, 367.) Even reading the will is not enough in such cases. (*Dufaur* v. *Croft,* 1 *Curteis,* 838. 3 *Hagg.* 266. *Clarke* v. *Sawyer,* 2 *Comst.* 498.) If, on the whole

case, it is doubtful whether the testator is competent, probate must be refused. (*Sutton* v. *Sadler,* 3 *C. B.* (*N. S.*) 87, *overruling* 2 *Greenl. Evidence,* § 689.) (6.) The execution of the will was clandestine. (*Paske* v. *Ollat,* 2 *Phillimore,* 323, *and cases before cited.*) 2. If the will be void, for these reasons, no subsequent declarations can make it good. (3 *Greenl. Cruise,* 137.) It must be republished. Declarations, unless part of the *res gestœ,* are only admissible to show capacity. (*Waterman* v. *Whitney,* 1 *Kern.* 157.)

*O. S. Williams,* for the respondents. I. The testator, at the time of the execution of the will, was of " sound mind and memory, and in all respects competent to devise real estate ;" in other words, he possessed the capacity requisite for making a valid last will and testament. His capacity was not merely that required by the law, which demands "nothing beyond the possession of *reason in its lowest degree* as in itself essential to legal capacity," (*Opinion of Senator Verplanck, in* 26 *Wend.* 303,) but he possessed much more : he had " a sound mind in a sound body." Having a vigorous constitution, he had always led the active life of a hardworking farmer up to the time of making the will—he then being over 60 years of age—and he continued to do so for some time after that event. A good farmer and close manager, he conducted in person the business of a farm of 200 acres ; directing and usually taking part in the manual labor necessary for its good care and profitable management; buying and selling as his business required and as opportunities presented, and looking after his pecuniary interests both at home and abroad. Although a man of limited education, he was not ignorant or stupid, and, in fact, was clearly superior to most men in the same department of life. He took an interest in the events of the day, and in all subjects of public and private importance. In 1837 he had a severe sickness, but with that exception, which was not of long continuance, his health was uniformly good, until December, 1847, when

he had a stroke of paralysis.   This attack affected the vigor of his system and diminished his activity, but it did not sensibly impair his mind, memory or judgment.   From its effects upon his body he recovered to a considerable extent, and down to the time of his last sickness and death, which occurred in December, 1857, he continued to manifest a good degree of physical energy ; and his faculties he retained to the last, unimpaired.

II. The testator, at the time of the execution of the will, was not *under restraint;* and this term is here used in the most latitudinarian meaning which is attached to it by any author, and is intended to include undue influence, fraud, artifice, and all attempts to practice upon, or to take advantage of, the ignorance, the weaknesses, the passions, the affections, or the sympathies of the testator, or the decay and infirmities of his body or mind.   What is the restraint, or, to use the term at present so much in vogue, the undue influence, which will render a will invalid ?   It is well described in *Williams on Ex'rs*, 1, 39.   The sort of influence which will invalidate a will is thus described by Eyre, C. B. in *Mountain* v. *Bennett*, (1 *Cox*, 335:)   " There is another ground, which, though not so distinct as that of actual force, nor so easy to be proved, yet if it should be made out, would certainly destroy the will ; that is, if a dominion was acquired by any person over a mind of sufficient sanity *to general purposes*, and of sufficient soundness and discretion to regulate his affairs *in general;* yet, if such a dominion or influence were acquired over him as to prevent the exercise of such discretion, it would be equally inconsistent with the idea of a disposing mind.   But the influence, to vitiate an act, must amount to force and coercion, destroying free agency : it must not be the influence of affection and attachment ; it must not be the mere desire of gratifying the wishes of another ; for that would be a very strong ground in support of a testamentary act.   Further ; there must be proof that the act was obtained by this coercion — by importunity which could

Lane *v.* Ranney.

not be resisted; that it was done merely for the sake of peace —so that the motive was tantamount to force and fear." If the definition of undue influence given in 3 *Bradf.* 507, differs from this, it is not founded on any good authority. The reports show, that a large number of wills are attacked for "undue influence." The result, in a great majority of cases, indicates that the thing charged exists not in the facts, but merely in the fancy of some disappointed contestant. *Note*, that both on this and the previous point, *affirmative* evidence must be produced. The suspicion or surmise of a party, or a witness, is not sufficient to establish it; and nothing is to be presumed without evidence. Whether a condition of weakened capacity existed at the time of the execution of the will, and whether the will was made and procured by the artifice, influence or control of others, is the subject of affirmative proof, and not of surmise and suspicion. (*Dayton's Surr.* 167. *Allen* v. *The Public Adm'r*, 1 *Brad.* 378.) The evidence on this and the previous point is so voluminous, that it is difficult to condense it for the purpose of an argument. We insist, however, that the result of all the testimony is to establish most clearly the capacity of the testator beyond a doubt or question.

III. There is nothing in the present instance to arouse suspicion or throw doubt upon the integrity of the whole transaction; and yet the case can safely be tested by the most rigorous rules which the most vigilant and circumspect tribunals may deem it proper to apply. In every case the *onus probandi* is thrown upon the party propounding the will for probate, and he must satisfy the conscience of the court that the instrument so propounded is the last will of a free and capable testator. If there are peculiar circumstances attending the case, the court will institute a more rigid scrutiny. The amount of evidence required may be greater, but the rules of evidence, and its character, remain the same. Proof that the will was drawn from instructions given by the testator, or that it was read over to him, is not indispensable.

(*Dayton's Surr.* 118, 119.   *Crispell* v. *Dubois*, 4 *Barb.* 393.) Previous or subsequent declarations, showing the intentions of the testator, and the dictates of natural affection or moral duty, in a particular case, are merely items of evidence, and not arbitrary rules, requiring the court to sustain or reject the will as they are present or absent. (*Allen* v. *The Public Adm'r*, 1 *Brad.* 378.) The contestants state two sets of circumstances which they claim are unusual, and which require special evidence on the part of the executors, in order to remove the suspicion which they excite, and establish the will. (1.) That the will is in the handwriting of Oliver P. Ranney, one of the persons named therein as executor, and who was the son-in-law of the testator, and lived in his family when the will was executed, and whose wife, Hannah Ranney, takes a large interest under the will. The answer to this suggestion is, that the rule of the civil law that " *Qui se scripsit hæredem*" could take no benefit under the will, has never had any *controlling* influence in England or in this country ; and the facts on which this rule was founded, and other facts analogous to them, merely go in to make up a part of the evidence of the case in which they happen to occur. They are circumstances which are always to be noticed by a court, and in a doubtful case may have much weight on the questions of capacity and undue influence ; but on the other hand, where the evidence removes all reasonable doubt on these points, the circumstances mentioned are of trifling importance. (*Dayton's Surr.* 118, 119, 165, *and cases cited.*) (2.) The contestants allege that the will gives but a small part of the estate of the testator to his daughter, Mrs. Lake, one of the contestants, and the wife of the other, and that this is contrary to the dictates of nature and his own expressed intentions. The answer to this is, that the fact is of little importance in itself: if the testator had capacity, and did what he intended to do, then the will must be sustained, even if it does not suit his relations, or his neighbors, or the court. And further, that the evidence clearly shows that

Lake *v.* Ranney.

he knew what he did, and that it fully met his approval. The appellants have given some evidence intended to show that the will was not understood by the testator, or did not express his real intentions ; and that the statements made by him to the witnesses prove these positions.    Without conceding that the evidence given establishes these positions, their force is fully met and answered by the comments made upon this kind of evidence in *Allen* v. *The Public Administrator,* (1 *Brad.* 392.)

IV.  The whole subject, and all these questions, have been before the surrogate ; he has heard the evidence from the living witnesses, and could judge correctly of the weight to which it was entitled ; he has admitted the will to probate, and on a question of fact his decision is not to be reversed by any nice distinctions drawn from the books, or even by the doubts of the courts.    The evidence in this case, however, must satisfy the court, as it did the surrogate, that the instrument in question is in fact and in law the last will and testament of a testator who knew what he wished to do, and who was fully capable of carrying his wishes into execution.

*By the Court,* ALLEN, J.   The will of John Goodhue, deceased, was propounded for probate by Oliver F. Ranney and Harlow Goff, the executors named therein, and was contested by the appellants for the want of testamentary capacity in the deceased, as well as upon the ground that its execution was procured by fraud and undue influence.

Over thirty witnesses were examined before the surrogate and testified at length to facts bearing with more or less force upon the questions involved, and showing the character, history and business capacity of the testator, his relations to and with the parties litigant up to and at the time of his death, and the relation of the litigants to each other and the degree of their intimacy with the testator, and their connection with the will and its execution.   While it is difficult to group to-

gether the facts and circumstances found and relied upon either to support or impeach the will, it is impracticable to give anything like a perfect analysis of the testimony.   Only the more prominent facts can be referred to, and the many minor circumstances which color and give character and peculiar significance to the main facts must be passed by.

John Goodhue, the testator, died in December, 1857, aged eighty-one years, leaving him surviving as his heirs at law two daughters, Clarissa Lake, one of the appellants and the wife of her co-appellant Ransom Lake, and Hannah Ranney, one of the defendants and the wife of Oliver F. Ranney, one of the executors named in the will.   The wife of the testator died in January, 1855, and the alleged will bears date and was executed in July of the same year.   Mrs. Ranney was married in 1841, and Mrs. Lake in 1853.   Mr. and Mrs. Ranney came to reside with the testator in the fall of 1844, and continued to reside in the same house with him up to the time of his death.   The evidence as to his business capacity in early life, the effect of disease and of age upon his mental faculties, and his testamentary capacity at the time of the execution of the will, and his freedom from a subjection to restraint, coercion, or undue influence of any kind from those by whom he was surrounded, is in this, as in most cases of this character, somewhat conflicting.   We are so constituted that our social relations and our sympathies and our prejudices influence our perceptions and bias our memories, as well as our opinions and judgments.   Hence two individuals of equal intelligence, integrity and opportunity for observation and judgment, will observe and note facts as it were through entirely different mediums, and honestly report the facts with different colorings, and arrive at directly opposite conclusions, or conclusions essentially differing from each other.   There is no class of cases in which the evidence is necessarily less satisfactory and conclusive than those involving the validity of acts depending on the mental capacity of the actor.   With the witnesses before the judge, with ample op-

Lake *v.* Ranney.

portunity to test their integrity and judge of their competency to speak understandingly of the matters to which they are called, the judgment may be far from satisfactory even to him who pronounces it. The witnesses are ordinarily not experts, and they are selected because they can testify to and relate facts, or circumstances, or opinions favorable to the party calling them, and courts and juries must determine from the imperfect light which these isolated facts, and perhaps partizan opinions, furnish. The court of review has not the advantage of·inspecting and personally examining the witnesses, and can only try them and weigh them by the record of their testimony ; and if the judgment of this court was final, when sitting in judgment upon the decree of an intelligent surrogate, I should hesitate before I would agree to reverse it in a doubtful or·balanced case. But as the only effect of a reversal is to submit the question, upon such evidence as may be adduced, to another tribunal and that a jury of twelve men, we may scrutinize more freely the evidence before the surrogate and his adjudications upon it. The testator was a farmer, competent to manage his farm and transact his ordinary business and make a good bargain up to 1837, when he had a severe fit of sickness, which " affected his activity and energy—diminished them." His former son-in-law, the husband of a deceased daughter, a physician, testified that " from the time of his severe sickness, down to 1845, he got back in some measure to the point where he started from, but never entirely recovered after this fever. From the time of this sickness down to the death of his wife his health was declining, or his body was breaking down. I think his mind failed him ; he did not retain his mental capacity for doing business ; his judgment failed in some measure; his mind weakened; might be called a weakness of mind. Was easily affected to tears. Little things overcame him." In 1847 he had a stroke of paralysis, which disabled him, and the same physician testified that " since he had this fit he has not, in my judgment, been capable of doing busi-

ness.   This was in February, 1847.   From the fall previous
to the death of the testator's wife, down to 1849, he was not
capable of doing business, in my judgment.   Testator, I
should rather think, was not capable of doing ordinary busi-
ness from spring of 1844 to 1847."   There was considerable
evidence of the same general import, and much that conflict-
ed with it.   But that to some extent after the illness of 1837,
he was enfeebled in body and mind, I think cannot be ques-
tioned upon the evidence.   Neither do I think that it can be
fairly claimed that the testator was mentally incompetent to
make a will ; that he was not of sound and disposing mind
and memory to the extent held necessary for testamentary
purposes.   In other words, he had, as it would seem, " tes-
tamentary capacity" at the date of the will.   He was an ig-
norant man, had but little knowledge of figures, and kept no
accounts.   For all purposes of arithmetical calculation and
written memoranda, he always depended mainly on others.
In 1844, and before the death of his wife, he is described by
one of the witnesses as " very childish," and " easily influ-
enced by others ;" and he and his wife were anxious to get
some one to live with him and attend to his business, and
was advised to have one of his children come and live with
him.   He is also described as " forgetful" at this time, and
according to the testimony of many of the witnesses, exhib-
ited many evidences of senility and mental debility, as well
as bodily infirmity.   Ranney and his wife were invited to
come, and did come up from New York, and take up their
residence with the testator, on account of the infirmities and
inability of the latter, and to take charge of his business and
affairs generally.   The wife of the testator died in the Janu-
ary following, and her death seriously affected his health and
spirits.   From the time he came to live with the testator,
Ranney had the general charge and control of the business,
and exercised a very decided influence on the testator, and
most business matters, and all of any importance were com-
mitted to him.

At the time of making the will the testator was worth, in real and personal property, from $8000 to $9000; and by the will propounded he gave the bulk and all but $1000 of it to Mrs. Ranney, giving to his executors, of whom Ranney was one, the remaining $1000, the interest of which was, when and only when the executors should think necessary, to be applied to the support of Mrs. Lake, and if she died during the life of her husband, the principal was bequeathed to her lawful issue, and if she died without issue, then to Mrs. Ranney. The will was drawn by Ranney, and its execution witnessed by Robert J. Norris, in whose store Ranney was employed as a clerk, and by a fellow clerk of Ranney, a lad about 15 years of age, who were called from the store about two miles distant of a Saturday afternoon, for that purpose, and no other person was present. Ranney was about the house, and came to the door of the room once or twice. The will was not read by or to the testator in the presence of the witnesses, and they had no knowledge whether or not its contents were understood by him. There is no evidence in this case that the will was ever read to the testator, or read by him, before its execution, and the only evidence that it was read to him at any time is his declaration, as late or later than 1850, testified to by a servant in the family, that he had heard it read, and it was as he thought it was ; and the same witness testifies that in 1854, he heard the testator say that he would like to have the will read. By whom read, or when, or whether read correctly, does not appear. Mrs. Lake was not at the house of her father during the summer of 1845, and the contents of the will were concealed from her.

Considerable evidence was given upon either side to show the state of feeling between the testator and Mr. and Mrs. Lake. The respondents proved by one witness that at one time the testator said that Lake was a drinking man, and he did not like him, and that his daughter married him against his will ; and the same witness testified that the testator

called Lake a drunken sot, and that the testator appeared to think well of Mrs. Lake. And by another witness it was proved that Mrs. Lake lived at home up to the time of her marriage, and was on good terms with her father; and it is in evidence that the testator alleged as a reason for not inviting Lake to come and live with him rather than Ranney, that Lake's father required his services and attention upon his business. Ranney came to live with the testator under an agreement by which he was to receive for his compensation fifty acres of land in the division of the estate, beyond the share and portion which would otherwise come to him in right of his wife. In 1844 or 1845 the testator said that he had given the fifty acres to Ranney, but whether he would remain with him or not he did not know, and what was left of his property he intended for his children; and that he intended to leave his affairs so there could be no chance for a quarrel for his children. To another witness, in speaking of the arrangement with Ranney, he said he was to give him a deed of fifty acres of land, and he, Ranney, was going to take care of him, and that he should keep the remainder of his farm as long as he lived, and then intended to have it divided among his children. At other times he said he had made a will, and had given fifty acres of land to Ranney and divided the rest of his property equally between his two daughters; that his property was to go to both his children; and that he knew no difference in his children. To a nurse of Mrs. Ranney he is proved to have said that Mrs. Lake had got all his property she ever would get, unless she came to want.

Without going more in detail into the evidence, it is established:

1. That by the will propounded the division of the estate of the testator between his two daughters, his only heirs at law, is grossly unequal.

2. That the will was prepared and witnessed by Ranney, who in right of his wife, is the principal beneficiary; she being entitled by its terms to the bulk of the estate and con-

tingently and in a measure dependent upon the discretion of her husband, to the whole estate.

3. That Ranney, who prepared and now propounds the will, at the time of the execution of the will, and from that time to the death of the testator, was a member of the family of the testator, and held a fiduciary and confidential relation to him.

4. That the testator, by reason of his infimities, mental and bodily, as well as his ignorance, was liable to be imposed upon by one capable of practising a fraud upon him in respect of the contents of his will and the disposition of his estate.

5. That the will was executed under circumstances somewhat peculiar and suspicious, and without all the cautions and safeguards usually adopted, and without such as the propounder of the will should, with reference to his own reputation in the circumstances in which he was placed, to guard against misconstruction have regarded, to the end that the witnesses might know that the writing published as a will was in truth the voluntary and unbiased act of the testator, properly and fully declaring his intentions.

6. There is no evidence that the will had ever been read to the testator, or that he knew the contents thereof.

7. There is no evidence that the testator ever directed, or gave instructions for, the preparation of the will as prepared and executed by him.

8. The evidence is not satisfactory that the testator intended to distinguish between his daughters, in the distribution of his property, or that he knew that he had done so by the will prepared by Ranney and executed under his supervision, and perhaps it might be added that there is some evidence that he supposed the provisions of the will were different from what they proved to be.

In ordinary cases it is sufficient for the individual offering a will for probate to prove a compliance with the formalities prescribed by statute; but when circumstances of suspicion

exist, more is required, and proof should be given to satisfy the tribunal that is called to pronounce upon it, that the paper offered is in truth the will of the testator, declaring his intentions. There should be some affirmative evidence that the testator knew the contents of the will, and that it expressed his real intentions—that his mind went with the will.

The proof most usually given, because the most accessible, is of instructions for the preparation of the will, and of previously declared intentions consistent with the will, together with evidence of the reasonableness of its provisions. But there is no line of evidence prescribed, and any evidence is competent, as well as sufficient, which satisfies a court or jury that the will was in truth executed by the testator with full knowledge of its contents, and voluntarily executed, without restraint, coercion or undue influence of any kind.

In this case the fiduciary relation of Ranney to the testator, his agency in drawing the will and procuring its execution, and the beneficial interest of himself and family under it, created a presumption of fraud and undue influence, which could only be overcome by some satisfactory evidence that there was no fraud practiced, or undue influence exercised, over the testator.

When a will containing a devise in favor of the medical attendant and confidential adviser of the testator is drawn by the devisee himself, it is said it would be more satisfactory to the court to have direct evidence that the testator gave instructions for drawing the will, or that it was read over to or by him; yet that such evidence is not indispensable, but that there must be some affirmative evidence that the testator knew the contents of the will, and that it expressed his real intentions. (*Crispell* v. *Dubois*, 4 *Barb.* 393.)

In another well considered case it was held that when there was no evidence that the testatrix had anything to do with the preparation of the will or that she ever read it or heard it read, or that its contents were ever even stated to her,

proof that she knew what was in the paper she signed is imperatively demanded before the same can be admitted to probate ; especially when it affirmatively appears that the mental faculties of the testatrix had become seriously impaired by the use of strong drink and opiates.    (*Burritt* v. *Silliman,* 16 *Barb.* 198.)    The case was reversed by the court of appeals, but upon a question of evidence not touching the principle for which the case is now cited.    (3 *Kern.* 93.)    See also *Van Pelt* v. *Van Pelt,* (30 *Barb.* 134.)    Where a testator, and a devisee under his will, by whom the same is drawn, stand in the confidential relation of client and counsel, that circumstance alone calls for great circumspection, and a will executed by a person who was prostrated by sickness, and in a state of mind in which he readily yielded or assented to the suggestions of others, in favor of his counsel, whose influence over him was very great and who drew the will, was held invalid, in the absence of evidence to show that it was in accordance with previous directions, or that any directions were given, or that the testator had previously designed to give him anything.    (*Newhouse* v. *Godwin,* 17 *Barb.* 236,) affirming the decree of the surrogate of Kings' county, refusing to admit the will to probate.    And see *Clark* v. *Fisher,* (1 *Paige,* 171 ;) *Same* v. *Sawyer,* (2 *Barb. Ch. R.* 411 ; *S. C.* 2 *Comst.* 498.)

In every case the *onus probandi* lies on a party propounding a will, and he must satisfy the conscience of the court that the instrument so propounded is the last will and testament of a free and capable testator. · (*Barry* v. *Butler,* ·2 *Moore's P. C.* 481.)    We are also referred to *Scoular* v. *Plowright,* decided in 1856 by the judicial committee of the privy council in England, and reported in the *Law Times* of January 3, 1857, (28 *Law Times,* 194,) the eminent author and jurist Dr. Lushington giving the opinion.    It was there decided—and with the decision all the cases in our own courts agree—that in ordinary cases, where there is execution and capacity, the validity of a will is established, but

Lake *v.* Ranney.

when the will is prepared by the party principally benefited an exception prevails, and it is necessary to prove that the testator had full knowledge of the instrument and its contents, and executed it freely and without undue control, especially if the circumstances are suspicious. The facts of that case differ somewhat from that at bar, but not so essentially as to distinguish the two cases in principle. But the rule as recognized and applied is a general rule applicable to all cases coming within it, and is decisive of this case. It may be said in this as was said by Dr. Lushington in the case cited, that under the circumstances so much suspicion rests upon the whole transaction that it is imperatively necessary for the court to be satisfied that the deceased was a perfectly free agent and had a knowledge of the contents of the instrument he executed. The case stands thus: The will is preceded by no declaration of any intention to execute an instrument of that tenor, nor, after its execution, is there any conclusive or satisfactory evidence of a recognition of its contents. Indeed there is considerable evidence that he was ignorant of its contents. The will is propounded by the person principally benefited, and the contents of the will were concealed from every one, during the life of the testator. The attesting witnesses do not show any knowledge by the deceased of the contents of the will. Under these circumstances, and with the proof in the case of the control and general influence of Ranney over the deceased, the order of the surrogate admitting the will to probate must be reversed and issues settled to try the questions arising upon the application to prove the will; and the issues when settled, must be tried, upon the motion of either party, at a circuit court to be held in Oneida county. The costs of this appeal to the appellants may abide the event of that issue, and be paid out of the estate to the one finally successful. (30 *Barb.* 144.)

[ONONDAGA GENERAL TERM, October 2, 1860. *Allen, Mullin* and *Morgan,* Justices.]