22 541
67 532

JAMES L. PHIPPS AND MARY A. PHIPPS, APPELLANTS, v. WILLIAM H. VAN KLEECK AND OTHERS, RESPONDENTS.

*Will—when probate thereof will be refused, on the ground that it was procured by undue influence.*

Circumstances under which the court will refuse to admit a will to probate, on the ground that it was procured by undue influence, considered.

The decision of the surrogate in refusing probate to the will in question affirmed, on the ground that the illness and mental condition of the testator at the time of its execution, imposed upon the legatee the burden of establishing, by clear and satisfactory evidence, that she had not unduly used her influence in procuring its execution; and that she had failed to give such evidence.

APPEAL from a decree of surrogate of the county of New York, admitting to probate a will, executed by James D. Ingersoll, deceased. It was claimed by the appellants that another instrument, executed by the testator subsequent to the will admitted to probate, was his will, and should have been admitted to probate in place thereof.

*John Hallock Drake*, for the appellants.

*J. A. Shoudy*, for the respondents.

DANIELS, J.:

The testator was a bachelor, owning an estate at the time of his decease, on May 23, 1876, amounting to the sum of about $30,000. The will which was admitted to probate was drawn by the testator himself and executed on April 28, 1874, when his health was unimpaired and his mind was sound. By its terms he provided for the distribution of his estate, chiefly among his relatives. Before that time he sustained intimate and friendly relations with the contestants of this will, but he made no provision whatever in favor of either of them by its terms. It is to be inferred from that omission that he did not regard the existence of this very friendly intimacy as a sufficient reason for making either of these persons participants in the estate which he should leave at the time of his decease. Near the end of December, 1875, he left the city of New York, where

he had been living at the St. Nicholas Hotel, and went South. But the afternoon and evening before his departure, and at his own invitation, one of his executors visited and dined with him. During their interview this will was made the subject of conversation between them, and was referred to by the testator as containing a satisfactory disposition of his estate. There is nothing in the case tending to discredit this evidence in the least, or to indicate the remotest probability that at the time he left New York he was in any respect disposed to change the terms of his will. But, on the contrary, the presumption is warranted by the circumstances, that they met his complete and perfect approval. And for those reasons it cannot be inferred that he could have been influenced or induced, merely by his friendship for the contestants afterwards, to make them, or either of them, the recipients of his estate.

About the middle of February, 1876, the contestants went to Jacksonville, and the testator called at the hotel where they then were, to visit them. They remained there several weeks and he called upon them in a friendly and familiar way every day. From there all three went together to Savannah. The testator preceded the contestants from that place to Augusta, where he secured quarters for them at the same hotel, and met them at the depot upon their arrival there a short time afterwards. They continued there until the latter part of March, when the testator, who was then nearly seventy years of age, was attacked with paralysis. The evidence shows this to have been very severe in its effects upon his mind as well as his body. Practically it rendered him helpless and dependent upon the friendly attentions and offices of the contestants. They, and particularly Mrs. Phipps, kindly watched him and cared for his wants. The services rendered were those which his condition needed, and he appears to have been conscious of his dependence upon these two friends. When they concluded to return to New York, by his request he was taken with them, and to their residence, instead of the hotel where he had previously made his home. They reached New York on May 1, and on the 3d of that month, and only twenty days before his own decease, the testator made another will, giving all his property to Mary A. Phipps, one of these friends, and appointing the other, her hus-

band, his sole executor. To this will he did not subscribe his name, as he had to the one of 1874, which had been framed and written by himself. And no reason seems to have arisen rendering any change in the disposition of his property proper, beyond the care and attention bestowed upon the testator during his illness, extending then but little beyond the period of one month. During the short interval between his return to New York and the execution of this second will he had no intercourse with either of the persons who were to be made participants in his estate, under the terms of his preceding will; and for that reason no cause could have arisen for dissatisfaction with them. They must then have accordingly remained as justly entitled to participate in his estate, as they were in his own judgment when these provisions were so deliberately made by him in their favor, and which he regarded as so satisfactory in his last proven allusions to them, as he was about to leave for the South. It was not shown that he was apprehensive that his disability and illness would be long-continued, as they were not, and for that reason should be provided for by any radical change in the disposition of his estate. And if it had been, the attention and services required by his condition could have been adequately and fully recompensed, without the consumption of the mass of his estate.

The change which was made cannot be accounted for by reason of his circumstances. Neither gratitude nor justice required so much from him. And as no cause for dissatisfaction had arisen on the part of the relatives designed to be provided for by the terms of the will of 1874, no special reason for the direction last given appeared in the case. It is probable that the testator understood that he was making this will. That he had sufficient capacity for that purpose was shown by the evidence of Dr. Marcey, his attending physician; and that he understood the contents of the instrument subscribed by him, appeared from the evidence of the counsel who drew it. But these circumstances are not sufficient to secure it legal validity, if the testator was improperly influenced to withdraw his property from his relatives and bestow it upon a stranger to his blood, whom he had not previously considered to be an object of his testamentary bounty.

Up to the time of the commencement of his fatal illness, his design was firmly established that his relatives should receive the bulk of his estate. Immediately after that occurrence he became much enfeebled, both bodily and mentally, and, with slight improvement, so continued until the will of 1876 was made. His condition was such that the vigor, which was shown to have characterized him in health, had disappeared. The emotions exhibited by him indicated that he had, without any other reason than that of his sickness, become capricious, and the dependence he felt upon the contestants rendered him a plastic instrument of even slight influences exerted over him on their part. What would not have affected him in health, would then prove entirely controlling over his conduct. As the evidence stands, there is no reason for presuming the exercise of that influence by the executor himself. What he did was to procure the counsel to draw the will and the witnesses to attest its execution, and in both he seems to have acted under the directions of the testator. But how the purpose was brought into existence which rendered these acts necessary, did not positively appear. The circumstances shown rendered it evident that the testator had been under the care and attention of the contestant, Mary A. Phipps, during the entire period of his illness. His condition was such as would not probably have suggested the expediency of another will, wholly different in its provisions from the one already so carefully made. There was no other person than her from whom the suggestion of such a change would have been likely to have originated. And on one occasion, while he was still in Augusta, a change of that nature was stated to have been suggested by her. His dependence upon her had become such as to render him subject to her influence; and that she availed herself of her opportunities for its exercise is reasonably evident from the circumstance that he became willing to bestow all his property upon her, when he had deliberately designed that it should have been otherwise disposed of, while he was in the full possession of his health and mental faculties. What transpired between this contestant and the testator can only be inferred from circumstances, but they are such as to exclude the conclusion that he so far changed his previously fixed intention, as to withdraw his property wholly from the control of

his preceding directions, and devote it to her, without some controlling influence over him on her part.

Whether this were so or no, formed no part of any interview with the testator when the last will was subscribed by him; he appeared generally to understand the import of his act, so far as it affected her, and at the time to intend what he did. But how that state of mind had been brought about was not shown. It was probably one of the caprices of his condition, created and controlled, as the surrogate found it had been, by the exercise of an improper degree of influence over him. The will was not natural in its provisions. It gave his estate a direction, which, according to his own probable volition, it would not have received. And by that it was assigned to the person upon whom he had become mainly dependent, and who chiefly had his care and custody. For this purpose he was practically in her power, and it was incumbent upon her to show, under the circumstances, that this will in her favor was his free, uninfluenced, as well as voluntary act, before she could be entitled to have it legally sustained. That she did not do, but left the case as it was, affected by the facts indicating a different and adverse presumption. Upon this subject it has been held, that in proportion as the infirmities of the testator expose him to deception, it becomes imperatively the duty, and should be anxiously the care, of all persons assisting in the testamentary transaction, to be prepared with the clearest proof that no imposition has been practiced, but that the testator did, in fact, fully understand every portion of the paper which he executed as his will (1 Jarman on Wills, 39), and when the existence of undue influence is affirmed, it may " be shown by all the facts and circumstances surrounding the testator, the nature of the will, his family relations, the condition of his health and mind, his dependency upon and subjection to the control of the person supposed to have wielded the influences, the opportunity and disposition of the person to wield it, and the acts and declarations of such person." " If one takes advantage of the affection or gratitude of another, to obtain an unjust will in his favor, using his position to subdue and control the mind of the testator, so as substantially to deprive him of his free agency, then the fact that affection or gratitude was

the moving cause makes it no less a case of undue influence." (*Roll-wagen* v. *Rollwagen*, 63 N. Y., 504, 519, 520; *S. C.*, 3 Hun, 121; *Blewitt* v. *Blewitt*, 4 Hagg., 410.) In this last case it was decided that "the strong presumption of law is always adverse to an instrument materially altering and controlling a will deliberately framed, regularly executed, recently approved, and supported by previous acts of disposition; and it is difficult to conceive a case in which that presumption would exist with more force than in the present, looking to the former wills, to the condition of the deceased, to the parties in whose favor the codicil was to be made being at the time about the person of the deceased, and to the absence of other parties to whose prejudice these alterations were to operate." This will was written in the interest and probably at the instance of the sole legatee named in it, before he had seen either of his relatives after his return, when the testator was mentally and physically enfeebled and personally helpless, for the purpose of bestowing all his estate upon her, and without reason excluding those who had been the preceding objects of his bounty from all participation in it, and after he had been subjected to her influence through all the time of his illness. Before it could properly be admitted to probate, it was necessary that some satisfactory evidence should have been given, warranting the conclusion that she had not so used opportunities as to produce this testamentary result in her favor. (*Crispell* v. *Dubois*, 4 Barb., 393; *Lake* v. *Ranny*, 33 Barb., 49; *Tyler* v. *Gardiner*, 35 N. Y., 559.) No such proof was given in this case, and for that reason the surrogate was justified in deciding that the circumstances so far indicated the existence of undue influence, as to render the will relied upon by the contestants invalid.

The objections taken to the rulings of the surrogate, as to the admissibility of evidence received and excluded, do not seem to rest upon any substantial foundation. There was an abundance of evidence showing what the condition of the testator was, without that which has been drawn in controversy. The case was not disposed of upon that ground, but because there was reason to believe that the will was obtained by means of undue influence, and the rulings made as to the evidence had no special relevance to the

existence of that circumstance. As long as that was made out, whether the evidence objected to should be received or excluded was not of the least practical consequence. Upon that subject the surrogate was sustained by the well established facts, in his conclusion, and for that reason· the decree appealed from should be affirmed. ·

DAVIS, P. J., and BARRETT, J., concurred.

Decree affirmed.