## VAN PELT vs. VAN PELT.

Where the court is satisfied that, though a testator's capacity was slender, he yet had a disposing mind, if the evidence is sufficient to show that he fully understood, and intended to make, the disposition which he has made of his property, the will must stand, however unnatural and unjust may be its provisions.

Where the testator is unable to read or write, is extremely ignorant, is weak in understanding, and is susceptible to influence, or the victim of passion or prejudice, a simple compliance with the statutory forms of execution will not be sufficient to render the will valid.

The burthen of proof is shifted in such a case. The party propounding the will is bound to show, not only that the formal acts required by the statute, in all cases, were performed, but that the testator's mind accompanied the will; that he knew what he was executing, and was cognizant of the provisions of the testament.

If there is not sufficient evidence to establish the fact that the will was carefully read over to the testator, and that he fully understood its contents, a feigned issue may be awarded, to try that question and other questions arising upon the application to the surrogate for probate of the will.

APPEAL from a decree of the surrogate of Richmond county, admitting to probate the will of Jacob Van Pelt, deceased.

*William Watson,* for the appellant.

*Lot C. Clark,* for the respondent.

*By the Court,* DAVIES, J. The testator, Jacob Van Pelt, died on the 9th day of October, 1856, at the age of seventy-seven years. He was twice married. By the first wife he had ten children, of whom seven survived him, and two others had died not long before him, leaving issue. After the death of his first wife he married a widow having several children. There were no children of the second marriage. During his early life he was an oysterman. In his advanced years he devoted himself principally to the cultivation of his farm. He accumulated a good estate, a principal part of which consisted of his farm. For many years his sons

Van Pelt *v.* Van Pelt.

labored with him faithfully in his business of oystering, and in the management of his farm; and it is in proof that at that time he declared himself pleased with their conduct, and expressed his intention of leaving his property to those who had assisted him to earn it. He left a will dated the 22d day of September, A. D. 1845, the principal clause of which is in these words: "After all my lawful debts are paid and discharged, I give, devise and bequeath to my loving wife, my real and personal estate as it now stands, to enjoy and possess for ever, and that my said wife may have a full and perfect right to sell, give by will as she pleases, and to whom she pleases." He appointed his wife and Reuben P. Wells (by whom the will was drawn) his executors. Some of his children and grandchildren were in destitute circumstances, and it is testified as to them, there had been no unkindness of feeling on the part of the testator, though to some of his sons there is evidence that he entertained feelings of displeasure, if not of enmity. Without stating particularly the testimony of the several witnesses called and examined before the surrogate, it may be said the following facts are proved:

The will was drawn by Reuben P. Wells, who seems to have been a justice of the peace, residing in the neighborhood of the testator. The directions for drawing the will were given by the testator himself, the wife not then being present. The will was forthwith drawn, was read by Wells to the testator, and was then executed in presence of the other witnesses, one of whom was the brother of the testator's wife. The certificate of its execution and acknowledgment was in due form; but the will was not read to the testator in the presence of either of the witnesses, nor did they know that the testator was aware of it, or understood the contents of the paper.

The daughter of Wells had, a year or two before the execution of the will, married the son of Mrs. Van Pelt, the testator's second wife. Wells was on intimate terms with Mrs. Van Pelt and the testator, and was made the custodian

of the will from its execution till the death of the testator. Neither the making nor the contents of the will were made known to the children of the testator.

The testator was a man wholly without education. He could neither read nor write. His natural capacity would seem to have been not very inferior, but to have been wholly undeveloped, except as to the acquisition of money. But even in that direction, it was not so developed as to enable him to compute, except in small sums, or to very limited amounts. He could not discriminate between bank bills of various denominations, except between one or two dollar bills and five dollar bills. The common coin in circulation he seems to have known. But some of the witnesses state that if he sold a load of hay of one thousand pounds' weight at one dollar and fifty cents a hundred, or a skiff-load of oysters at fifty cents a hundred, he could not tell how much the loads came to. For many years he was accompanied by his sons and others when selling oysters in the city, and they would compute the price of his oysters, receive and count the money, and pay it over to him. After the will was executed, one witness (Brown) states that when the testator wished to compute the price of a thing, and no person was present to do it for him, he would do it by beans. "He would take and count eight big beans for a dollar, and small ones for sixpence." For many years before his death his conversations were rambling and disconnected. During all his life, it would appear from all the testimony, that his mode of conversing and speaking was singular, so as frequently to be difficult of comprehension, especially to those not intimately acquainted with him. He was a man of quick and sullen temper, of violent passions, of great obstinacy, and strong prejudices. If irritated against any persons, he was bitter and rough in his conduct towards them. But if his confidence was obtained, he was very much under the influence of the person who had won it. He was very suspicious. Several witnesses state that he did not know the difference between facts wit-

Van Pelt *v.* Van Pelt.

nessed by himself and information derived by hearsay, and that he would testify positively, and as if upon his own knowledge, to matters that he merely heard stated, not distinguishing between hearsay, or supposition, and fact.

The witnesses for the appellant speak of his mental capacity as being very limited, as do several of the witnesses for the respondent. But this incapacity was rather the result of an entire want of education, and of an indulgence in passion, than of a defect of understanding. When a matter which, stated in ordinary language, was quite beyond his comprehension, was explained to him in terms with which he was familiar, he could understand it, especially if the explanation was slowly and deliberately made. His memory was formerly good within the range of subjects with which he was conversant; but for ten or twelve years before his death it had become much impaired.

Though commonly prudent and shrewd in the management of his pecuniary affairs, it is abundantly clear from his conduct at the division of his father's estate, that if his passions or prejudices were aroused, he utterly lost sight of his own interest. His conduct at the time of his mother's funeral shows that he was equally blinded by passion to obligations, which are usually the most powerful over the minds of men.

We are all of opinion, however, that though the testator's capacity was slender, he had still a disposing mind; and if the evidence is sufficient to show that he fully understood, and intended to make, the disposition which he has made of his property, the will must stand, however unnatural and unjust may be its provisions.

Does the evidence in this case show that fact ? In other words, when the testator is unable to read or write, is extremely ignorant, is weak in understanding, and is susceptible to influence, or the victim of passion or prejudice, will a simple compliance with the statutory forms for a valid testamentary act, be sufficient to sustain the will ?

It has been said by a most learned jurist, who has illustra-

ted the surrogate's court of the most populous county in the state for several years, and the too early termination of whose judicial services is a public loss, that the statutory forms "are necessary, but even when satisfied by the evidence, do not always entitle the will to be admitted to proof. Something more is necessary to establish the validity of the will in a case where, from the infirmities of the testator, his impaired capacity, or the circumstances attending the transaction, the usual inference cannot be drawn from the mere formal execution. Additional evidence is therefore required, that the testator's mind accompanied the will, and was cognizant of the provisions of the will." (*Wier* v. *Fitzgerald,* 2 *Bradford's Sur. Rep.* 69.)

In the case of *Mowry* v. *Silber,* (*Id.* 133,) the decedent was seventy-five years of age, his mind and memory were impaired, and though he was not legally incompetent to make a will, it was properly held that a testamentary disposition of his property ought not to be sustained unless proved to have been fairly made, to have emanated from him of his own free will, without interposition of others, and to have accorded with his intentions, otherwise expressed, or implied from the state of his family relations. It was declared not to be enough, in such a case, to show that instructions were given by the testator, especially when he was so situated that the instructions might have been procured by undue influence. And it was there held that, in case of an unequal will, executed by a person weak in mind and body, at the house of the party most largely benefited, the execution of which was not communicated to the children of the decedent, and the provisions of which were not in harmony with his previously expressed intentions and dispositions, the ordinary presumptions flowing from the formal act of execution, did not obtain; that the burden was thrown on the party seeking to establish the testamentary act of proving that precautions were taken, and explanations had, to secure to the testator the full and free action of his impaired faculties; and that in

such a case the order of proof was reversed, and it should be shown affirmatively that no imposition was practised.

It was, as I understood it, upon substantially the same grounds that the same learned judge put the decision in the recent and very interesting will of *Henry Parish.* The will and the earlier codicils were sustained; for when they were made, the testator was in possession of his powers and faculties, and fully able to communicate his intentions to others. The later codicils were rejected, though the formal acts of execution seem to have been performed. But the power of the testator was so far weakened, and he was so situated, as to expose him peculiarly to the exercise of undue influence, while his ability to make known his precise wishes was rendered at least very questionable.

Substantially the same ground has been laid down in numerous other cases. Thus, in *Chaffee* v. *The Baptist Missionary Convention,* (10 *Paige,* 85,) the chancellor said that when the testator was illiterate and incapable of reading and writing, it was proper the whole should be read over to him, in the presence and *hearing* of the witnesses; and that the fact of such reading in his presence, should be stated in the attestation clause, or at least the witnesses should, by inquiry of such illiterate testator, ascertain the fact that he is aware of the contents of the instrument which he executes and publishes as his will; and that he is possessed of a competent understanding to make a testamentary disposition of his property. The learned chancellor decided, however, that the neglect of these provisions will not render the will invalid, if the court and jury before whom the question of its validity is tried, are satisfied, upon the whole evidence, that the will was duly executed, and that the testator understood its contents.

Without stopping to cite other authorities to support these views, as might be easily done, I think it may be stated as a general rule, that where the circumstances which attend this case are found—the age, the ignorance, the inability to read

or write, the exposure to influence on the part of the testator, the conceded fact that he is, and has for many years been, wholly swayed by passion and prejudice—there the mere compliance with the statutory formalities of execution is not sufficient. The burden of proof is shifted. The party propounding the will is bound to show, not only that the formal acts required by the statute in all cases were performed, but that the testator's mind accompanied the will ; that he knew what he was executing, and was cognizant of the provisions of the testament. The true question presented by this case is, whether the proponent has succeeded in assuming this burden and establishing this fact. For my part, I do not think she has. At the utmost, it can only be said that her proof leaves the question in doubt. I think it hardly does that.

In the first place, the main provision of the will, that which gives to the wife the ultimate power of disposition over the property after her own life, is at variance with every feeling of nature in the testator. For the natural result of that provision must be to send the property from his own name and blood to strangers. Such a result is at war, too, with feelings which the testator had entertained and declared, for many years before the will was made, and which he freely expressed about that time, and frequently afterwards, till near his death.

Though the state of his feelings towards some of his sons might warrant the belief that he designed to disinherit them, there is no pooof of any such intention towards others of his children, or towards any of his grandchildren ; the proof being that he was always kindly disposed to the latter, and that some of them were in destitute circumstances. Although *it* is plain that the older children had but little intercourse with their father or the inmates of his household, after the second marriage, and had, therefore, but little opportunity of proving the direct exercise of undue influence over the testator, by his wife, yet the case is by no means free from circumstances

which strongly indicate such an influence. The witness Brown, the principal if not the only witness who was an inmate of the testator's family during his last years, states, that Mrs. Van Pelt often spoke against his children, to the deceased ; she dwelt frequently on the fact that Prior (one of the sons) owed the old man and would not pay him ; and she said that he (testator) was a fool to let him have any thing without he paid for it. So Parker states that Mrs. Van Pelt had great influence over her husband, in many instances.

Seven witnesses on the part of the contestants, all of whom knew the testator intimately and for long periods, give it as their opinion, that the testator had not sufficient knowledge to understand, without explanation, that such a will as he did sign, would enable his wife to give the estate by will away from his own children. Monel, a witness called for the purpose, says that he thinks the testator had capacity to understand the will, if it *was read and explained to him in plain words; very plain, he adds, they ought to be, for he had no education.* The other witnesses for the proponent do not materially contradict this statement, thus strongly fortified. They speak of certain particulars, in which the capacity of the testator seemed greater to them than the witnesses on the other side had stated it to be. And Doctors Eddie and Harrison think that his capacity to make a disposition of his property by will about an average one. But they had only a limited acquaintance or intercourse with him ; and though very intelligent witnesses, their opinions, under the circumstances, do not by any means outweigh those of the eight witnesses on the other side.

It was insisted, at the argument, that this evidence of opinion, on the part of the witnesses for the contestants, was inadmissible, within the case of *Dewitt* v. *Barley*, (5 *Selden,* 371.) That case, however, expressly concedes that in the ecclesiastical courts such evidence has generally been admitted, and is authority only as to what is or is not admissible in tri-

als in actions at law. The reasoning of the learned judge, who delivered the prevailing opinion, does not seem to me to apply to the courts christian, where judge and jury are both one.

The only testimony in the whole case to show that the testator was made aware of the effects of the will, or understood its provisions, is that of Wells. He says he took the instructions for drawing the will from the testator himself, and that when drawn he read it over to him. There is not a word of his explaining its effect or results. It was simply read to him, without comment or explanation. To my mind, the instructions given to Wells for drawing the will bear the marks of influence. They show that his mind had been carefully prepared for giving them. But they do not indicate any thing more than he told Parker he meant to do, just about the time the will was made : *That as his wife had been a good wife, she should have a good home as long as she lived.*

The only proof then, that the testator was made aware of the contents and effect of the will, is this simple declaration of Wells. But he was under very strong influences to sustain the will. His daughter had married the son of Mrs. Van Pelt, the sole devisee and legatee under this will. If the will was established, the whole of the property might, a very considerable part almost certainly would, come to his son-in-law and daughter. Nor is Wells' testimony free from suspicion. Though that marriage took place two years before the execution of the will, he was unable upon his cross-examination to state whether the marriage was prior or subsequent to the execution of the will.

Upon the whole case, I do not deem the evidence sufficient to meet the requirements which the law imposes on the party propounding such a will as this for probate.

The case of a blind man was mentioned at the argument, and it was sought to show that what was done in this case was sufficient to uphold the will of a blind person. No doubt

Van Pelt *v.* Van Pelt.

there may be cases where, from the blindness being congenital, the testator may be wholly unfamiliar with affairs, and peculiarly exposed to undue influence.   A will made by such a one, especially if it was at variance with the declarations or known intentions of the testator, might require to be read over to him in the presence of the witnesses, its contents explained, and the capacity of the testator inquired into and ascertained.   But in case the blindness had supervened late in life, and upon a man of business, familiar with the world, then, I feel no doubt, it would be sufficient if he gave instructions for drawing the will, and if it could be proved that it had been read over to him, though not in the presence of the attesting witnesses.   Especially would this be so, if there were no violence done by the will to the natural claims of kindred, and the declared intentions of the testator.   In such a case, the only question would be whether the paper executed as the will had been honestly and truly read over to the testator, before his execution of it.

The testimony of an unimpeached, impartial and disinterested witness, that such a will had been carefully read over to the testator, that he fully understood its contents, added to the testimony of the attesting witnesses, and the compliance with all the statutory forms, would seem to leave no doubts that the paper propounded was the will of the testator.   This fact must be satisfactorily established, before any court is justified in allowing the paper writing produced, to be probated as the will of the testator.   In my judgment, there is not sufficient evidence in this case to establish that fact.   I am not satisfied that it is the will of the testator in fact ; and not being so satisfied, the order of the surrogate cannot be affirmed, but should be reversed.

The decision· of the surrogate admitting the will to probate was erroneous, and must be reversed.   But this reversal being upon a question of fact, a feigned issue must be made up to try the questions arising on the application to prove the will ; and the same must be sent for trial to the next circuit

Freligh *v.* Brink.

court, to be held in Richmond county. The costs of this appeal, to the appellant, may abide the event of that issue, to be paid out of the estate if he is finally successful.

[Kings General Term, February 9, 1858. *S. B. Strong, Davies* and *Birdseye,* Justices.]