JEFFERSON COUNTY—HON. MILTON H. MERWIN, SURROGATE—February, 1863.

## CLARKE *v.* DAVIS.

*In the Matter of proving the Last Will and Testament of* JOHN CLARKE, *deceased.*

Where no failure of memory was exhibited at the time the will was executed, and the testator is not shown to have had any disease of the brain which permanently impaired his mental faculties,—*Held,* that the facts of his old age, declining health, and his failure to recollect or understand certain transactions, do not prove a want of mental capacity to make a will.

A statement made by the testator after the execution of a codicil, to a daughter whom he had therein disinherited, that he had given her the sum of $600, and no such sum appeared in the will,—*Held,* not sufficient to prove a want of capacity. The capacity of a testator to make a will must be determined by what happened at its execution, and not what afterwards occurred.

The influence to vitiate an act must amount to force and coercion, destroying free agency. It must not be the influence of affection and attachment, nor the desire of gratifying the wishes of another. The proof must be, that the act was obtained by coercion; by importunity that could not be resisted; that it was done merely for the sake of peace, so that the motive was tantamount to force and fear. The natural influence of a wife, arising from her relations with the testator, without proof of any specific acts, will not amount to such coercion.

J. F. STARBUCK, *for Proponent.*

J. CLARKE, *for Contestant.*

THE SURROGATE.—John Clarke, of Ellinburgh, aged about 71 years, died on September 11, 1862, leaving a will and codicil, which are now presented for probate. The will was made August 9, 1861, and, among other things, gave to Mrs. Brooks and Mary Davis, children of his daughter, Caroline Davis, $245 each; and to his daughter, Caroline Davis, an equal share with the rest of his children. The codicil was

made July 23, 1862, and revoked the legacies made by the will to Caroline Davis and her daughter Mary.

The codicil is contested by Mrs. Davis, on the ground of the incapacity of the testator, and undue influence.

The deceased was an old man, in declining health, though not confined to his house, having considerable property, and ordinarily very close in his bargains and dealings generally. As far as the evidence shows, his mental capacity was as good at the time he made the codicil as it was the year before, when he made the will, although it is probable that physically he was not as well. Upon the occasion of the execution of the codicil, there was no particular exhibition of mental weakness. He had previously spoken to Hopkinson a number of times to draw it, and appears to have urged the matter. On the day the codicil was executed, he went to Hopkinson's store, told him what he wanted done and how he wanted his will changed. The same witnesses were called as were to the will, upon the suggestion of the deceased that it would be less expensive. One of the subscribing witnesses was the family physician, and the other a merchant, the partner of Hopkinson, both men of intelligence, and had been acquainted with deceased a number of years. They both think the deceased was capable then of making a will—no failure of memory was then exhibited. He had no disease of the brain that permanently disabled or impaired his mental faculties. He is shown to have been capable of understanding ordinary business transactions, and especially any thing that affected his own pecuniary matters. Instances are given of his failure to recollect some things and understand some transactions, but nothing that shows him permanently in that state. If the evidence of the two subscribing witnesses and of Hopkinson is to be believed, and I see no reason why it should not be, the deceased had sufficient mental capacity to make the codicil, unless the character of the provisions of the codicil is such as to overcome that evidence.

By the codicil, the deceased disinherited one of his daughters and revoked a legacy he had given to a grand-daughter.

CLARKE v. DAVIS.

For doing as he did to the grand-daughter, he at the time gave a rational reason, if true. I have no doubt he supposed it true, although afterwards he was informed and believed it was not so. For disinheriting his daughter, he gave as a reason that he had determined her husband should not have control of any of his property; that he had nothing against his daughter, but that if she got the money she would give it up to him if he wanted it. Another circumstance is sworn to by the daughter, which should be mentioned here; and that is, that the deceased, about a week after the codicil was made, told her that he had willed her $600, and specified what he wanted her to do with it.

Now the fact of disinheritance, as repulsive as it may be, is not of itself sufficient to prove the deceased incompetent. That would not be a safe rule to establish. A man in his sane mind has a right to do with his property as he chooses. The motives that impel him, in most cases, we cannot determine. He is himself the judge of what is right. The act may seem to us unnatural, when, if we knew his inmost feelings, it would seem otherwise. The act may be, in fact, wrong; still, if not against good morals or public policy, we have no right to say any thing against it. The only question is, Was it the voluntary act of a competent mind? (See *Van Pelt* v. *Van Pelt*, 30 *Barb.*, 134.)

As to the statement made by the deceased to Mrs. Davis after the codicil was made, if true, it may be more difficult to explain. He said he had given her $600. That amount was not mentioned in the will. It may be that her interest in the will would have amounted to that. It may be he had in his mind another will that he intended to make, or that Mrs. Davis was mistaken in the date. If she was right in the date, it would follow that deceased either meant to deceive her, or had forgotten about the codicil. Suppose the latter state to be the fact, would it show him incompetent to make the codicil? I think the capacity of the deceased to make it must be determined by what happened then—not what afterwards occurred.

Under this state of circumstances, I think I must hold that deceased had sufficient capacity to make a will, and that if the codicil is his voluntary act, it must stand. Chancellor KENT, in *Van Alst* v. *Hunter* (5 *Johns. Ch.*, 158), lays down what is now probably considered the correct rule, that "the law looks only to the competency of the understanding, and neither age or sickness, or extreme distress, or debility of body will affect the capacity to make a will, if sufficient intelligence remains." (See, also, 26 *Wend.*, 231; 7 *Paige*, 236; 21 *Wend.*, 142; 3 *Den.*, 37; 8 *Mass.*, 370; 9 *Pick.*, 212; 1 *Bradf.*, 360; 17 *Barb.*, 236.)

Was the codicil the voluntary act of the deceased? Was it his own act, or the act of another? Was any undue influence brought to bear upon him, from any source, to accomplish that result?

The influence, to vitiate an act must amount to force and coercion, destroying free agency. It must not be the influence of affection and attachment. It must not be the desire of gratifying the wishes of another, for that would be very strong ground in support of a testamentary act. Further, there must be proof that the act was obtained by this coercion, by importunity that could not be resisted, that it was done merely for the sake of peace, so that the motive was tantamount to force and fear. (1 *Jarman on Wills*, 40; *Gardner* v. *Lardner*, 22 *Wend.*, 526.) If a dominion was acquired by any person over a mind of sufficient sanity for general purposes, and of sufficient soundness and discretion to regulate his affairs in general; yet, if such a dominion or influence were acquired over him as to prevent the exercise of such discretion, it would be equally inconsistent with the idea of a disposing mind. (EYRE, C. B., in *Mountain* v. *Bennet;* 1 *Cox*, 355, cited in 4 *Williams on Ex.*, 44, ed. of 1859; *Stultz* v. *Schæffle*, 18 *Eng. Law & Eq.*, 576.)

At the time the codicil was executed, nothing happened to show it was not the voluntary act of the deceased. Neither is there any evidence that the ideas of the codicil were suggested to him by anybody else. It is claimed, however, that

undue influence was exercised over the deceased by his wife, and that she had a motive for such acts, in her hostility to Mr. and Mrs. Davis. It appears there was some ill feeling between Mrs. Clarke and Mr. Davis, arising from their different religious belief, though I think the evidence does not show that this ill feeling extended to Mrs. Davis. True, Mrs. Davis swears that Mrs. Clarke, in 1860, told her she would prevent her getting any of her father's property, but Mrs. Clarke denies it. The will of 1861 was afterwards made, giving Mrs. Clarke her share. No other expression to that effect, from Mrs. Clarke, is shown; and since then, they appear to have been on good terms.

Mrs. Davis testifies that, in the winter of 1861–2, Mrs. Clarke spoke against Mr. Davis, complaining that he had spoken against her belief, and that she would be enough for him; that if she could not in one way, she would in another. No reference was made to property matters. By the making of the codicil, Mrs. Clarke was in no way pecuniarily affected. So that, pecuniarily, or as against Mrs. Davis, there was no motive for Mrs. Clarke to change the will.

As to the influence Mrs. Clarke had over her husband, there is not much evidence. Mrs. Davis says, that in 1860 there was some dispute between Mrs. Clarke and her husband about the arrangement of her property matters after his death; that she wanted certain things for her life, and not under the control of Hopkinson, and Mr. Clarke did not want it so; and that Mrs. Clarke afterwards told her she had got the matter arranged according to her wishes. It is not easy to see the importance of this, or the probability of its occurrence, when it also appears that Mrs. Clarke gets comparatively nothing under the will, but that she gets her rights, almost entirely, under an ante-nuptial agreement, made in 1854, and that whatever she does get under the will, Hopkinson has the control of.

Mrs. Clarke was much younger than her husband, and healthy, and very likely she had a good deal of influence over him,—though her declarations to that effect I do not consider

of much importance, unaccompanied by acts. He was old and feeble, and liable to outside influence; but the case fails to show the exercise of any influence over him to the detriment of Mrs. Davis, or to influence him to make the codicil, and no motive for such influence as to Mrs. Davis or her daughter Mary. From the simple fact that she disliked Davis, I cannot reasonably infer that she wanted Mrs. Davis disinherited, or her daughter deprived of her legacy; especially as Mrs. Clarke swears she advised the deceased to do directly the contrary.

.I cannot, therefore, find that the codicil was made by reason of any undue influence exercised by Mrs. Clarke. Upon the whole case, I find the codicil to be the voluntary act of the deceased. He undoubtedly considered Davis a litigious man. Mrs. Davis was not in need of his money, and he therefore concluded to do as he did. The legacy to Mary Davis was revoked under a mistake of fact, with grounds, however, of belief. It is the misfortune of the legatee that the deceased, when he found out his error, did not rectify it; I cannot rectify it for him.

The will and codicil are admitted to probate.