Smith, P. J.
—The opposition to probate in the surrogate’s court was put Upon the ground that the papers propounded were the product of a disordered and diseased mental condition which rendered the testator incapable of making a, will, his mind and" moral sense having become impaired and enfeebled, and he having become subject to delusions in consequence of the excessive and continued use of alcoholic drinks. Upon the subject of the testator’s habits in respect to the use of intoxicating liquors, and their general effect upon his system, intellectual, moral and physical, a, large amount of testimony was given, which it would be neither convenient nor useful to refer to in detail. The bulky volumes constituting the appeal book have been read attentively, and the entire testimony has been considered, carefully, as I think, with the aid of the very able arguments submitted by counsel on each side, orally and in print.
In stating my views upon this branch of the case, to wit, the condition of the testator with respect to the testament- ' ary capacity, except as he may have been affected by delusions, I shall not attempt to do more than to summarize the case briefly and to state concisely my conclusions. The examination has convinced me that the testamentary provision made by the deceased for his daughter, the contestant, although so small in comparison with the amount of his estate, or even with the portion of it which she would have been entitled to if he had died intestate, as that, under ordinary circumstances, it would have seemed harsh and unjust, not to say unnatural, towards her, was, nevertheless, the expression of his will, founded upon reasons which seemed to him good when his mind was active and he was in all respects capable of disposing of his estate. The evidence shows very clearly, I think, that his action in respect to his daughter was largely influenced by a determination on his part to dispose of his estate in such a way, if possible, as that, while her needful wants- should be provided for, no portion of his property should in any event be enjoyed or controlled by the mother of Harriet, from whom „he had been divorced.
That he disliked and distrusted the mother and the influences by which she was surrounded, especially after her marriage with her cousin, appears by conclusive evidence. It was doubtless with a view to securing that result that he bequeathed to his daughter the income of a specified sum of money, during her life, instead of giving her such sum absolutely. The sum named—$100,000—he evidently thought would produce an income sufficient with her other means to supply her wants. As he is proved to have stated on some occasion that the sum thus set apart for bis *105 daughter’s use was about what she would have inherited from him if he had died intestate while her mother was liis wife—and in that he was probably correct—it may be supposed that he considered that circumstance in fixing the amount. Whether the conclusions he reached, assuming that they were the product of a sane mind, were the result of just and proper views of his relations to his daughter and of the feelings and designs of her mother; whether he had lost affection for his daughter by reason of her absence and estrangement from him, and whether a wise course of action on his part while she was growing up, might have prevented such estrangement, are questions foreign to the issue. It is impossible to read the case without a feeling of sympathy for this young lady whom circumstances beyond her control made a stranger in her father’s house from her early childhood. But as her father had the legal right to dispose of his own, even to the total disinheriting of his only child, if he saw fit to do so, we can only inquire whether the testamentary papers left by him were made in the free exercise of a sound and disposing mind. And the fact that the provision made by him for his daughter is much less than" she would have received in case of his intestacy, however unreasonable or unjust it may seem, is not of itself evidence that he lacked testamentary capacity. Van Pelt v. Van Pelt, 30 Barb., 134; La Bau, v. Vanderbilt, 3 Redf,, 384.
That the testator was addicted, for years, to the excessive use of intoxicating drinks, induced in great part by the disease known as diabetes, with which he was afflicted, is an unquestioned fact. The usual tendency of the habit, long continued, to impair the intellect and the moral sense, cannot be denied. But proof of the habit, and the fact of such tendency, are not enough for the contestant’s case. In order to invalidate the will by reason of such habit and the tendency of it above mentioned, it must appear that at the time of its execution the testator was so enfeebled in mind by his habitual use of intoxicants, or was then intoxicated to such a degree as to be incapable of making a will. At this point the contestant fails. So far as the subscribing witnesses to the will or either of the codicils speak upon the subject, their testimony is ah the other way. It does not occur to me that any witness in the case testifies that or near the time of the execution of the will, or either of the codicils, the testator was intoxicated to any degree.
In respect to the question how far the habit of excessive drinking had effected him at the different periods of his life, when the several testamentary papers were executed, *106 there is a conflict of testimony, medical and lay. But running through almost the entire case is a current of proof, of which his letters are a conspicuous part, justifying the conclusion that down to á time later than the date of the last codicil, and almost to the day of his death, his naturally vigorous intellect was active and bright, and he was capable of attending, intelligently and carefully, to the business of his estate and his affairs, except at such hours of the day as it was plainly to be seen that he was inebriated. And, as has been said, it was not at such hours that the will or either of the codicils was executed. In short, the testimony taken as a whole, although conflicting in many respects, seems to warrant the conclusion that at the time ■of the execution of the will and the several codicils respectively, the testator had the mental capacity to execute the same, unless, as is contended on the part of the contestant, the partial disinherison of his daughter was the result of certain delusions by which it is claimed his mind was possessed and controlled.
The testimony respecting the alleged delusions is substantially as follows:
First. During the year or two succeeding the divorce, which was procured in May, 1871, Mr. Tracy availed himself of the provision contained in the decree, permitting him to have interviews with his daughter at all proper times. She then resided with her mother, in or near New York, and was five or six years of age. The interviews were at a hotel in New York, and the child was accompanied by her nurse, who was present at the several interviews. Mr. Tracy is shown to have said, in substance, on ■several occasions, referring to those interviews, that the servant told him he could not see his daughter alone, that such were her orders. One witness, Mrs. Reed, testified that on one occasion in the winter of 188A5, when witness breakfasted with Tracy, he told her that there was a detective with the nurse and child; that he saw the detective when he went to the door. Margaret Dooley testified that she was the nurse who went with the child, that she never told Tracy he was not to see his daughter except in her presence, and was never requested to do so; and that no detective ever accompanied her.
Second. In the summer of 1872 Mrs. Tracy, the testator’s mother, sent a watch to Harriet, as a gift. At that time the testator was in Europe, and he knew nothing of the matter until he returned. There is evidence tending to show that the testator subsequently had the notion that the watch was returned, and that the grandmother received a letter from an attorney in New York to the effect that she must not attempt any further communication with her *107 grandchild, except through him. It is shown that the watch was not returned, but whether the letter referred to was or was not received or written, does not appear.
In these respects, and also in believing that Harriet’s mother wished any portion of his property, if he did so believe, it is contended by the appellant’s counsel that the testator was under a delusion which influenced the provisions of his will in respect to Harriet, and that in consequence of such delusion, probate should have been denied.
That the testator was under a mistake as to the enforced presence of the servant, the employment of a detective, the return of the watch, the attorney’s letter, and the wishes of Harriet’s mother respecting his property, maybe true, but it by no means follows that he was under what the law terms a “ delusion ” in those respects which will invalidate his will. A delusion to have that effect must be an insane •delusion, which a recent author has said ‘ ‘ is often briefly defined as exhibited in the belief of facts which no rational person would have believed, and in the inability to be reasoned out of such belief.” Buswell on Insanity, § 13. Or, as has been still more tersely said, “ the essence of delusion is that it has no basis in reason, and cannot be dispelled thereby.” Merrill v. Rolston, 5 Redf., 220. To the same effect are numerous reported cases, which need not be referred to at length; the bare citation of a few of them will be enough. Among them are American Seamen’s Friend Society v. Hopper (33 N. Y., 619); Dew v. Clark (Add. Ecc., 279); Forman’s Will (54 Barb., 274); Stanton v. Wetherwax (16 Barb., 259); Merrill v. Rolston (supra).
The case is barren of evidence of an insane delusion as thus defined. However much mistaken the testator may have been in the ideas above stated, there was nothing insane or irrational about them, and there is no proof that evidence was ever presented to him tending to show that he was mistaken in respect to them. In regard to the interviews at the hotel, the nurse was in fact present. Whether her version of what occurred there accorded with his understanding of the matter, can never be known. As to the detective, the testator may have seen one, or a person whom he took to be one, at the door, as he said, when he went there with the child and nurse. If he did, was it irrational, in view of the existing state of affairs between him and the mother, disclosed by the evidence, that he should infer that the detective was purposely placed there ? He had been advised some six months before, from different sources, that in view of then recent events, in which the mother was an actor, he would have no difficulty in getting possession of his child. Was it insane or irrational for *108 him to suppose that the mother suspected he might make the attempt at such interview, and had guarded against it by the employment of the detective whom he saw or thought he saw ? Of the watch transaction he had no personal knowledge. It occurred when he was absent from the country. His information about it appears to have come from his mother, and from her, probably, he got his idea respecting the attorney’s letter and its contents. There is no evidence that such a letter was not received. And there is no proof that he was ever told that the watch was not returned; in other words, that he showed himself incapable of being reasoned out of his belief on that subject.
The precautions which he took to prevent any part of his estate from going to the mother can hardly be regarded as evidence of an insane delusion in regard to her wishes. It was not unreasonable for him to suppose that if his daughter received more from his estate than she needed for her own use, her mother would be allowed to partake of it to some extent, and the possibility of that occurrence he was determined to prevent, whether or hot she entertained wishes which such occurrence would have gratified.
It is suggested by the counsel for the appellant, that some of the medical and lay testimony introduced before the surrogate was incompetent, and therefore the decision should be reversed. The answer is that all such testimony was received without objection. Indeed, it is 'conceded by the appellant’s counsel that both parties conceded that the medical testimony was admissible. All parties • having implicitly consented to its reception, it was properly before the surrogate for his consideration, and the fact that he considered it cannot be alleged as error. Besides, in our view, the rejection of that class of evidence would not affect the result.
The second codicil contains a provision revoking the provisions in the will and codicils in favor of any beneficiary who shall, in person or by another, contest the probate of the will, or either of the codicils. Section 2623 of the Code requires that a surrogate’s decree admitting a will to probate must state wrhether the probate was or was not contested. In accordance with that provision, the surrogate in his decree in this case, stated that the probate of the will was contested. The requirement of the statute is an answer to the application made by the contestant’s counsel to strike out the statement. The application is probably made in the apprehension that the statement may have a bearing upon the rights or liabilities of the parties, or some of them, under the revoking clause above referred to. Whether it has or not, is a question not properly before us. We merely decide that the statement is proper, as a matter of *109 procedure (Laws 1877, chap. 206, § 2; Throop’s note to § 2623 of the Code), and that the surrogate was right in holding that there was a contest within the meaning and for the purpose of the section cited.
The disposition made by the surrogate of the questions relating to costs and disbursements is concurred in for the reasons stated by him in his opinion upon those subjects.
The decree should be affirmed, with costs of the appeal to the executors, to be paid out of the estate.
Barker, Bradley and Childs, JJ., concur.